In re EMERSON, MARLOW & CO.

MANSFIELD v. CHICAGO TITLE & TRUST CO.

(Circuit Court of Appeals, Seventh Circuit.   April 23, 1912.)

No. 1,822.

1. BANKRUPTCY (§ 143*)—PROPERTY VESTING IN TRUSTEE—MONEY HELD AS AGENT OR TRUSTEE.

Petitioner, who owned several car loads of turkeys in a cold storage warehouse in Chicago, gave an order to the warehouseman to deliver all or any part of the same to bankrupt, which was a commission dealer in poultry and had agreed to forward the same to a purchaser in New York, without charge to petitioner. They were not shipped to such purchaser, however, but petitioner authorized the bankrupt to handle them as its own, and the bankrupt withdrew a car load and sold the same to a third person, using the proceeds to pay on its own debts. Neither its receiver nor trustee in bankruptcy received such proceeds. *Held*, that the relation between petitioner and the bankrupt with respect to the proceeds was that of debtor and creditor, and that petitioner had no greater rights as against the trustee than any ordinary creditor.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 194, 201, 202, 213–217, 223, 224; Dec. Dig. § 143.*]

2. CARRIERS (§ 3*)—"FORWARDING MERCHANT"—"FORWARDER."

A "forwarding merchant" or "forwarder" is one who ships or sends forward goods for others to their destination by the instrumentality of third persons without himself incurring the liability of a carrier to deliver them, and neither includes a consignor shipping goods nor a carrier engaged in transporting them.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 1, 462–478, 966, 967; Dec. Dig. § 3.*

For other definitions, see Words and Phrases, vol. 3, pp. 2926, 2927.]

Appeal from the District Court of the United States for the Eastern Division of the Northern District of Illinois.

In the matter of Emerson, Marlow & Co., bankrupts. From an order of the District Court, George D. Mansfield appeals. Affirmed.

Appellant, hereinafter called "petitioner," filed his amended petition in the District Court for an order on the appellee, hereinafter termed "receiver," to pay over to him the sum of $5,717.39, alleged to be a trust fund belonging to the petitioner, of which the receiver took possession as an asset of the bankrupt's estate. The receiver filed its answer denying the existence of any such trust fund. On reference duly had, the referee proceeded to hear the cause, and on November 2, 1910, dismissed the said amended petition for want of equity. Petitioner thereupon filed his peti-

tion for review, which was granted upon the hearing of said petition. On March 7, 1911, the District Court ordered that the said order of the referee disallowing the claim of the petitioner for preference and dismissing his said petition for want of equity be affirmed and the petition dismissed, and that the claim be allowed as a general claim for said sum of $5,717.39. Petitioner's appeal from said order of the District Court dismissing said petition for review for want of equity is now before the court.

From the record it appears that in December, 1906, petitioner bought from bankrupt, through one Emerson, its president, 10 car loads of turkeys to be delivered in February, 1907; that they were delivered, and placed by petitioner in the Chicago Cold Storage Warehouse Company's warehouse at Chicago, and were paid for by moneys borrowed from the warehouse company on the warehouse receipts issued for the turkeys, as security; that the turkeys were so delivered and paid for; that the price paid was 17 cents per pound; that they remained in storage till the fall of 1907; that in October, 1907, the bankrupt through Emerson, its president, had an offer, so he reported, from De Winter & Co. of New York for the whole lot of turkeys at 21 or 22 cents a pound (net 20 cents in Chicago); and that the bankrupt company agreed to act as the sales or forwarding agent for the owners of the turkeys—there being others in the same situation as petitioner—and to make no charge therefor, Emerson testifying that he felt under the deal, inasmuch as he had persuaded petitioner to buy and had offered to bear the loss, if any, growing out of the purchase by petitioner. When asked why he made no charge, he replied, "I got that when they bought them." When the financial part of the transaction was discussed, Emerson, president of bankrupt, told McAdam, who had large deals with the bankrupt, perhaps $2,000,000 a year, and who, as to this turkey deal, was in a similar position to, and negotiated for, petitioner, that he would forward the turkeys, draw the draft against them for 19 cents a pound, and turn the proceeds over to the warehouse company for petitioner, and keep the account separate from his general business. The storage company had orders from petitioner to deliver the turkeys to Emerson with the statement, "they to pay you as taken out, same basis as they pay you on the McAdam turkeys." Petitioner lived in Wisconsin and left his affairs to follow the same course those of McAdam did, though he participated in the interviews of October 17th and 21st. On about October 21, 1907, petitioner was advised through Emerson that De Winter & Co. had stopped shipments temporarily. At the same time Emerson wrote petitioner saying, "If you are satisfied, let us handle the turkeys the same as we would if they were our own." It was in response that petitioner wrote to the warehouse to deliver to bankrupt "any part of my frozen turkeys stored in your house by Emerson, Marlow & Company."

Up to this time none of petitioner's turkeys had been shipped, and he was not known to be in the deal by either De Winter or the Hollis & Rich Company. De Winter & Co. were understood by petitioner to be the purchaser of the whole lot, viz., those owned by petitioner, McCabe, and another; each owning so many car loads. Four car loads of McCabe's had been shipped to De Winter. The bankrupt had drawn against the bills of lading in each case at 19 cents per pound, caused his draft to be cashed by the Union Trust Company Bank of Chicago, and deposited the proceeds of the draft to its own credit in its general account in that bank, and held the same until the shipments were severally accepted and paid for by De Winter & Co., and then paid the amount over to McCabe by check on its general account, thus giving bankrupt several days use of the money in its own affairs. No charge was at any time made by the bankrupt for its services in attending to the transaction. On October 23, 1907, the bankrupt, being pressed for funds, withdrew a car load of petitioner's turkeys from the warehouse, some 30,520 pounds, shipped the same to a firm not theretofore mentioned to petitioner, viz, Hollis & Rich Butter Company of Boston, Mass., drew against the shipment for $6,500, that being in excess of 19 cents per pound, had the draft cashed by the said bank, and the proceeds placed to the credit of its general account in said bank, and checked the same out

in payment of its own obligations, some of it going to pay drafts drawn upon it by its seven branch houses, which. as petitioner claims, applied the same in payment of their several local debts, and in the purchase of poultry and other products. Hollis, Rich & Co. refused to honor the draft, claiming it was excessive, so that other disposition had to be made of the turkeys, which were afterwards sold for $5,717.39, the sum to which petitioner now lays claim. It is petitioner's contention that this money, either directly or in a substituted form, came into the possession of the receiver, thereby augmenting the bankrupt's estate, and that, whatever its form in the receiver's hands, it is a trust fund. which belongs to petitioner. On the other hand. the receiver contends that the funds sent by bankrupt to its branch houses were not for the purchase of poultry but for the payment of debts owing their several local banks from the bankrupt, and that purchases at the western branches for a few days prior to the bankruptcy were unpaid being represented largely by checks on the various local banks not presented at the time of the bankruptcy.

The referee found that the relation existing between petitioner and the bankrupt was that of debtor and creditor, that the funds received by the bankrupt on account of the said turkeys have not been traced other than that they, as a part of the commingled funds, were paid out for debts, expenses, supplies, poultry, and produce as aforesaid, and that the evidence failed to show that the bankrupt's estate has been benefited or augmented by said turkey deal; that neither the receiver nor the trustee herein received either of said sums of $6,500 or $5,717.39, or any part of either thereof, as such, or in substituted form.

The assignments of error present the two propositions: (1) That the court erred in holding that the relation between petitioner and the bankrupt was that of debtor and creditor; and (2) that petitioner had no lien upon the bankrupt's estate in the receiver's or trustee's hands.

George H. White, Abram E. Mabie, Willard F. Conkey, and John A. Irrmann, for appellant.

Samuel Alschuler, Percy V. Castle, Arista B. Williams, Jesse R. Long, and Howard P. Castle, for appellee.

Before KOHLSAAT and MACK, Circuit Judges, and SANBORN, District Judge.

KOHLSAAT, Circuit Judge (after stating the facts as above). [1] Petitioner, together with McCabe, who represented and acted for him in his absence, and Emerson, who acted for the bankrupt, testify that the transaction was intended to be out of the regular course of business; that the turkeys were not billed to the bankrupt; and that it was the intention that the bankrupt should be simply a forwarding agent. This, standing by itself, would be satisfactory evidence that such was the case. When, however, we come to consider the course of business subsequent to the alleged agreement, a different situation arises. The bankrupt was practically given possession of all petitioner's turkeys for the purpose of enabling it to carry out the transaction with De Winter & Co. It was permitted to deal with them as if they belonged to it. In its financial distress it proposes to give that grant of authority a wide construction, and tide itself over a hard place. Up to that time it had made no shipment for petitioner. It conceived the idea of withdrawing enough turkeys from petitioner's stock in the warehouse (as to which there would be no one to question its acts) to enable it to procure a sum sufficient to relieve its immediate needs. To do that, it drew a draft

for more than the turkeys were worth, attached it to the bill of lading, secured the money from its bank on a discount thereof, and proceeded to enrich its general bank account to that extent, and sent the turkeys to a theretofore unnamed consignee, willing to take all the chances of the draft not being honored or the turkeys accepted, so long as it could obtain several days relief. This scheme may have been, and probably was, in its details unknown to petitioner; but he, through the confidence reposed in the bankrupt, made the thing possible, and not only so, but permitted the bankrupt to act with all the powers and appearance of a factor or commission man. There is nothing in the record, except testimony of the petitioner, McCabe, and bankrupt, as to what the latter was to do in the premises to characterize the transaction as other than an ordinary commission deal with prepaid commissions. The transaction has none of the features of a forwarding agency or merchant.

[2] "Forwarding merchant", or "forwarder" are defined in the Century Dictionary as meaning:

"Specifically in the United States, one who ships or sends forward goods for others to their destination by the instrumentality of third persons. * * * Neither a consignor shipping goods, nor a carrier engaged in transporting them is a forwarder. The name is applied strictly to one who undertakes to see the goods of another put in the way of transportation without himself incurring the liability of a carrier to deliver them."

Assuming that there was a statement made that the bankrupt should act simply as a forwarding agent in the deal, can it be contended that when the parties afterwards enter into a course of dealings which clearly are those involving the relations of principal and factor, the transaction shall be interpreted by the prior conversation? Would not the acts themselves control, rather than the term by which they now are, or perhaps were, at the beginning designated?

It appears that the lot of turkeys, of which those in suit were a part, all controlled at the beginning by the bankrupt, some 2,000,000 pounds, were supposed, and represented by the bankrupt, to be substantially all the turkeys in the country. Petitioner and McCabe each owned about 250,000 pounds. It is apparent that any one of the owners might ruin the market; so that it was important that they should all be marketed under one management. This would seem to have been Emerson's motive in offering to take care of the "outletting." He was evidently running the deal and handling the turkeys as his own. The fact that Emerson was to pay the proceeds of shipments to the warehouse company in satisfaction of petitioner's indebtedness to it throws some light on the subject.

Interpreting the initial undertaking as stated by petitioner in the light of the manner in which it was carried out, it would seem that petitioner and his witnesses at the time failed to comprehend the significance of the terms alleged to have been used in the inception of the transaction. The law merchant may not be overcome by the misuse of some of its terms. It is conceded that petitioner is chargeable with whatever knowledge McCabe had of the methods used by the bankrupt in selling the turkeys. He therefore knew that

the latter was dealing in its own name with consignees; that he was not known in the deal; that moneys were paid to and to be paid out by the bankrupt to the petitioner and McCabe; that it had full control of shipments and was using its own judgment in, protecting the market from a slump, and was dealing with the turkeys just as though they were its own, and also knew that its powers with regard to the same and its course of business in handling them was as full and complete, and in all respects comporting with those of any factor or commission man. Under the facts of this case, we are unable to see how any trust relation arose between petitioner and the bankrupt, other than that which attends to too free exercise of confidence in one whose integrity is implicitly relied on. Were it otherwise, however, we are unable to say from the evidence that any part of the moneys realized from the sale of the turkeys came to the hands of the receiver or trustee in any form. The referee found that the funds received by the bankrupt on account of said turkeys have not been traced, and that no part of the same came to the hands of the receiver or trustee as such or in any substituted form. When the course of business between the bankrupt and its seven branch houses is considered, together with the latter's methods of handling the poultry trade, it would be straining the facts and the law to declare that any part of the estate came to the hands of either of said bankruptcy officials charged with a lien for this particular fund. The principles of law contended for by petitioner are too well settled to require citation; but the facts support the master's report, which and of itself is very persuasive, and not to be overcome except in very clear cases.

We find no error in the judgment of the District Court, and it is therefore affirmed.