## UNITED STATES *v.* AMERICAN UNION TRANS-PORT, INC. ET AL.

No. 44.   Argued October 11, 1945.—Decided February 25, 1946.

438

See 55 F. Supp. 682.

*Walter J. Cummings, Jr.* argued the cause for the United States. With him on the brief were *Acting Solicitor General Judson, John F. Sonnett* and *David L. Kreeger.*

*Harold L. Allen* argued the cause and filed a brief for appellees.

MR. JUSTICE RUTLEDGE delivered the opinion of the Court.

The United States appeals from a decree entered by a District Court of three judges permanently enjoining enforcement of an order of the United States Maritime Commission. The order required the appellees and others to answer within thirty days a questionnaire concerning certain aspects of their business transacted during 1940, 1941 and 1942.[1] The central issue is whether

---

[1] See note 4. Jurisdiction rests on § 31 of the Shipping Act, 46 U. S. C. § 830; 28 U. S. C. §§ 47, 47a; 28 U. S. C. § 345 (4). See *California* v. *United States,* 320 U. S. 577, 579.

appellees are within the coverage of the Shipping Act, 46 U. S. C. § 801, for this purpose.

On August 21, 1942, the Commission, upon its own motion, ordered an investigation concerning the lawfulness of the rules, regulations, practices and operations of named persons and firms, described as carrying on "the business of forwarding in foreign commerce . . . ." The order stated that from information before the Commission it appeared that a certain forwarding firm was engaging in practices which seemed to be in violation of § 17 of the Shipping Act, 46 U. S. C. § 816, and further "that the public interest requires a general inquiry to determine the extent of the existence of the said practices among all other forwarders in the port of New York subject to said Act, and the lawfulness of said practices under section 17 thereof . . . ."

Accordingly, the Commission sent to the persons and firms named a questionnaire containing the inquiry, among others, "Do you carry on the business of forwarding in connection with common carriers by water in foreign commerce?" [2] Each of the appellees answered this in the affirmative.[3] But negative answers were given to the question, "Is your company owned or controlled by or affiliated with any shippers for whom you act as forwarder or with any common carrier?"

---

[2] The inquiry was framed with reference to the statutory provision immediately in issue, namely, the definition of "other person subject to this Act" contained in § 1 of the Shipping Act, 46 U. S. C. § 801, set forth hereinafter in the text.

[3] In their complaint the appellees allege that the affirmative answers given were erroneous and were made "without knowledge of the import of the said question or of the kind or nature of the business which it was necessary to carry on, or the character of relationship with a common carrier by water in foreign commerce, which it was necessary to maintain, in order to fall within the said definition . . . ."

In December, 1942, the Commission held public hearings before a trial examiner pursuant to the investigation order. On the second day the hearings were adjourned *sine die* so that the Commission might obtain additional information. They have not been resumed.

On January 14, 1943, the Commission entered an order, pursuant to § 21 of the Shipping Act, 46 U. S. C. § 820, directing appellees and others to answer a questionnaire relating to their forwarding operations in 1940, 1941 and 1942. The answers were to be filed within thirty days. Before this period expired appellees instituted this suit to enjoin the carrying out of that order and the general order of investigation. Thereafter the Commission extended the time for answering the questionnaire, and on May 18, 1943, withdrew its order of January 14, issuing instead another under § 21. This order, like the earlier one, required the appellees to answer a questionnaire concerning their forwarding operations. The only difference, apparently, was that the information sought was somewhat more extensive. The parties agreed that the suit should be continued as against the order of May 18 without formal amendment of the complaint.

On November 30, 1943, the District Court denied the Commission's motion for summary judgment and granted a temporary injunction restraining execution of the May 18, 1943, order. The injunction was made permanent on November 30, 1944.[4] The court held that the Maritime Commission had no jurisdiction over the appellees since, in its view, they did not come within the definition of the term "other person subject to this Act" given in § 1 of the statute, 46 U. S. C. § 801. It refused, however, to enjoin

---

[4] The opinion of the District Court on motion for interlocutory injunction and on motion for reargument is reported in 55 F. Supp. 682. The opinion on final judgment, which was simply an adherence to the court's previous opinion, is not reported.

the order of August 21, 1942, on the ground that it had no jurisdiction to annul an order which itself did not adversely affect the complaining parties.

The question we are to review is whether the appellees are included within the designation "other person subject to this Act" as that phrase is defined in § 1 of the Shipping Act. The definition reads: "The term 'other person subject to this Act' means any person not included in the term 'common carrier by water,' carrying on the business of forwarding or furnishing wharfage, dock, warehouse, or other terminal facilities *in connection with* a common carrier by water." (Emphasis added.)

Substantially, the issue turns upon the meaning of "in connection with," that is, whether some relation of affiliation with the carrier is required, such as that exemplified in *Railroad Retirement Board* v. *Duquesne Warehouse Co.*, 326 U. S. 446; or, on the other hand, the statutory phrasing is satisfied by the type of relationship illustrated by the companion cases of *California* v. *United States* and *Oakland* v. *United States,* 320 U. S. 577.[5]

If, as appellees contend, "in connection with" covers only forwarding businesses actually affiliated with a common carrier by water in a corporate sense, or under the control of or pursuant to a continuing contract with such a carrier, then plainly the Maritime Commission is without jurisdiction over these appellees, since none of them is controlled by or affiliated with a common carrier by water in any such manner. All are so-called independent

---

[5] The agencies found subject to the Act in these cases were public authorities. Although some continuing contractual relationship may have existed between the state wharfinger and the carriers in the *California* case, no such relation existed, except as to one pier, in the *Oakland* case, a fact of which the District Court in this case obviously was not informed, in view of its contrary statement. See note 17.

forwarders and the case comes down to whether such forwarders are covered by the Act.

There is little or no dispute as to the nature of their business. They are primarily forwarders of freight, as that term is generally understood,[6] for transshipment in foreign commerce. The foreign freight forwarding business is a medium used by almost all export shippers. An exporter, intending to send goods abroad, consigns the merchandise to a forwarder who then makes all the arrangements for dispatching it to a foreign port. The forwarder must arrange for necessary space with the steamship companies, procure and prepare the many documents, obtain permits for the acceptance of freight at piers, and at times must find available storage space for the shipment until steamers are available. If requested to do so, a forwarder will secure whatever insurance is needed.

Forwarders also have many other incidental duties. They check the marks on shipping papers and containers

---

[6] See *Place* v. *Union Express Co.*, 2 Hilt. (N. Y.) 19, 25; *In re Emerson, Marlow & Co.*, 199 F. 95, 97; H. Rep. No. 1682, 77th Cong., 2d Sess., 5 *et seq.* Cf. the definition of "freight forwarder" in Part IV of the Interstate Commerce Act, 49 U. S. C. (Supp. V) § 1002 (a) (5), discussed at a later point in this opinion.

In addition to acting as freight forwarders, the appellees also act as freight brokers. And for their services as brokers they receive brokerage commissions or fees from the carrier with respect to the same shipments for which they act as forwarders.

In view of the disposition we make of the cause, we need not consider the argument made by the Government that in any case the appellees, because they also act as freight brokers and receive compensation from the carriers, come within the Maritime Commission's jurisdiction. Cf. *In re Gulf Brokerage and Forwarding Agreements*, 1 U. S. M. C. 533, 534, where it was said: "Brokers are not subject to the Shipping Act, 1916, and consequently agreements between carriers subject to that act and brokers are not of the character required to be filed under section 15 thereof."

in order to be certain that they are in accordance with the regulations of the country of destination. They convert weights and measurements into the metric system when necessary. They keep records, for the convenience of the exporter, of all shipments dispatched. They also prosecute such claims as may be required by the exporter against carriers, insurance companies, and any other parties in interest.

By engaging in these many activities of the forwarding business, independent forwarders—and particularly the appellees—act as agents of the shipper. They assume no responsibility for the transportation of goods.

We think the appellees are within the coverage of § 1. This conclusion is required not only by the broad and literal wording of the definition but also to make effective the scheme of regulation the statute established and by considerations of policy implicit in that scheme, as well as by the legislative history and the decision in the California and Oakland cases, supra. In order to place the discussion of our reasons in statutory as well as factual setting, we sketch below some of the more pertinent statutory provisions. In doing so we shall emphasize the consequences of including or excluding so-called independent forwarders, like the appellees, for effective administration of the Act and achievement of its policy. But first we turn to the definition in § 1 itself.

The language is broad and general. No intent is suggested to classify forwarders, covering some but not others, just as none appears to divide persons "furnishing wharfage, dock, warehouse, or other terminal facilities" into regulated and unregulated groups. California v. United States; Oakland v. United States, supra. The absence of any such suggestion becomes highly significant by contrast with similar definitions of other statutes more or less related to the Shipping Act. In these Congress,

when regulating carriers and "other persons," repeatedly has made plain the intent to cover only affiliates or other specially limited groups when this has been in fact its purpose.

Thus, in the legislation relating to railroads, forwarders were first covered expressly in 1942. 49 U. S. C. (Supp. V) § 1002 (a) (5). The definition in shortened paraphrase is limited to any "person," other than a carrier, holding itself out "to transport or provide transportation" which "in the ordinary and usual course *of its undertaking*" (A) performs the usual functions of a forwarder, "*and* (B) assumes responsibility for the transportation of such property from point of receipt to point of destination, *and* (C) utilizes, for the whole or any part of the transportation of such shipments, the services of a carrier or carriers . . . ." (Emphasis added.) Not only would language so explicitly limited be difficult to apply to a person not performing any part of the "transportation service" proper, cf. *Lehigh Valley R. Co.* v. *United States,* 243 U. S. 444; but the very limitations, altogether absent from § 1 of the Shipping Act, forbid identical constructions of the two definitions. See also, in relation to the different treatment of rail forwarders, the correlated definition of "service subject to this chapter." 49 U. S. C. (Supp. V) § 1002 (a) (7).

The same difference applies with reference to the definitions of the term "employer" in the Railroad Retirement Act of 1937, 45 U. S. C. § 288a, and the Railroad Unemployment Insurance Act of 1938, 45 U. S. C. § 351, construed in *Railroad Retirement Board* v. *Duquesne Warehouse Co., supra.* In each instance the statute declares that "employer" shall mean "any carrier . . . and any company" carrier-owned or controlled "*and* which operates any equipment or facility or performs any service . . . in connection with the transportation of pas-

sengers or property . . .," thus plainly setting forth as to others covered than the carrier both the affiliation requirement and that of performing part of the transportation service.

In the face of such repeated demonstrations that Congress makes its purpose plain, when it actually intends to limit the coverage of others than carriers to affiliates or to persons performing part of the transportation service, the conclusion hardly is tenable that it means the same thing when it employs more broadly inclusive language and wholly omits all such limitations. This view is further emphasized, as will appear, by the fact that to cut down the meaning of § 1 as appellees suggest would be to single out the term "forwarding" from all others in the definition and give to it a narrow application none of them possesses.

In view of these facts, it is doubtful that the wording of the definition is sufficiently ambiguous to require construction, more especially in view of the decisions in the *California* and *Oakland* cases. But if room for doubt remains, it is altogether removed by the considerations of policy and history to which we have referred. We turn accordingly to the statutory setting.

In several sections, for example, §§ 15, 16, 17, 20 and 21 (pursuant to which this proceeding began), "other persons" as well as common carriers by water either are made subject to affirmative duties or are prohibited from engaging in certain activities.

Section 15 [7] requires filing of specified agreements or memoranda with the Commission and exempts from the

---

[7] "Every common carrier by water, *or other person subject to this Act,* shall file immediately with the board [commission] a true copy, or, if oral, a true and complete memorandum, of every agreement with another such carrier *or other person subject to this Act,* or modification or cancellation thereof, *to which it may be a party or conform*

operation of the antitrust laws arrangements made by carriers and "other persons" among themselves or with one another which have been filed with *and approved by*

*in whole or in part,* fixing or regulating transportation rates or fares; giving or receiving special rates, accommodations, or other special privileges or advantages; *controlling, regulating, preventing, or destroying competition; pooling or apportioning earnings, losses, or traffic; allotting ports* or restricting or otherwise regulating the number and character of sailings between ports; limiting or regulating in any way the volume or character of freight or passenger traffic to be carried; *or in any manner providing for an exclusive, preferential, or cooperative working arrangement.* The term 'agreement' in this section includes understandings, conferences, and other arrangements.

"The board [commission] may by order disapprove, cancel, or modify any agreement, or any modification or cancellation thereof, whether or not previously approved by it, that it finds to be unjustly discriminatory or unfair as between carriers, shippers, exporters, importers, or ports, or between exporters from the United States and their foreign competitors, or to operate to the detriment of the commerce of the United States, or to be in violation of this Act, and shall approve all other agreements, modifications, or cancellations.

"Agreements existing at the time of the organization of the board [commission] shall be lawful until disapproved by the board [commission]. It shall be unlawful to carry out any agreement or any portion thereof disapproved by the board [commission].

"All agreements, modifications, or cancellations made after the organization of the board [commission] *shall be lawful only when and as long as approved by the board [commission],* and before approval or after disapproval it shall be unlawful to carry out in whole or in part, directly or indirectly, any such agreement, modification, or cancellation.

"Every agreement, modification, or cancellation *lawful under this section* shall be excepted from the provisions of the Act approved July second, eighteen hundred and ninety, entitled 'An Act to protect trade and commerce against unlawful restraints and monopolies,' and amendments and Acts supplementary thereto, and the provisions of sections seventy-three to seventy-seven, both inclusive, of the Act approved August twenty-seventh, eighteen hundred and ninety-four, entitled 'An Act to reduce taxation, to provide revenue for the Gov-

the Commission.[8]   The Commission is given the power to disapprove, cancel or modify, among others, any agreement which it finds to be unjustly discriminatory or unfair as between carriers, shippers, exporters, importers or ports, or between United States exporters and their foreign competitors; or to operate to the detriment of the commerce of the United States; or to be in violation of the Act. Obviously agreements or understandings between forwarders or between forwarders and shippers or between forwarders and carriers may be discriminatory in such a way as to violate the provisions of § 15.   Moreover, since forwarders arrange the terms of carriage for shippers with carriers, they may be the active agents who bring about the very types of agreement or arrangement the section contemplates the Commission shall have power and opportunity to outlaw.   Consequently jurisdiction by the Commission over forwarders would seem essential to effectuate the policy of the Act and the absence of jurisdiction well might prevent giving full effect to that policy.

Section 16 [9] forbids various forms of discrimination, as well as other practices, on the part of any common car-.

---

ernment, and for other purposes, and amendments and Acts supplementary thereto.

"Whoever violates any provision of this section shall be liable to a penalty of $1,000 for each day such violation continues, to be recovered by the United States in a civil action." 39 Stat. 733; 46 U. S. C. § 814.  (Emphasis added.)

[8] See the language of the statute, note 7 *supra;* and see Current Legislation, 17 Col. L. Rev. 357, 358.  It should not be necessary to emphasize, in view of the statute's plain language, that, as is indicated, the exemption arises *not* upon the mere filing of the agreement, *but only after approval* by the Commission.

[9] "That it shall be unlawful for any *shipper,* consignor, consignee, *forwarder,* broker, or other person, *or any officer, agent, or employee thereof,* knowingly and willfully, directly or indirectly, *by means of false billing, false classification, false weighing, false report of weight,* or by any other unjust or unfair device or means *to obtain or at-*

rier by water "or other person," which an independent forwarder readily may commit or induce. It is suggested, however, that whatever discriminations might be practiced necessarily would be in pursuance of an agreement between a carrier and a forwarder who, it is well to point out again, acts as agent of the shipper; and that since Congress has given the Commission jurisdiction over the carriers, it is to be presumed that such jurisdiction was thought to be sufficient.

Whether or not the premise is correct, the conclusion does not follow. That the Commission may have jurisdiction over one of the two parties to a discriminatory agreement or arrangement hardly means that it shall not have jurisdiction over both. Indeed, unless the juris-

---

*tempt to obtain transportation* by water for property *at less than the rates or charges* which would otherwise *be applicable.*

"That it shall be unlawful for any common carrier by water, *or other person subject to this Act,* either alone *or in conjunction with any other person,* directly *or indirectly*—

"First. To make or give any undue or unreasonable preference or advantage to any particular person, locality, or description of traffic in any respect whatsoever, or to subject any particular person, locality, or description of traffic to any undue or unreasonable prejudice or disadvantage in any respect whatsoever.

"Second. To allow any person to obtain transportation for property at less than the regular rates or charges then established and enforced on the line of such carrier *by means of false billing, false classification, false weighing, false report of weight,* or by any other unjust or unfair device or means.

"Third. To *induce, persuade,* or *otherwise influence any marine insurance company or underwriter,* or agent thereof, not to give a competing carrier by water as favorable a rate of insurance on vessel or cargo, having due regard to the class of vessel or cargo, as is granted to such carrier *or other person subject to this Act.*

"Whoever violates any provision of this section shall be guilty of a misdemeanor punishable by a fine of not more than $5,000 for each offense." 39 Stat. 734, as amended by 49 Stat. 1518; 46 U. S. C. § 815. (Emphasis added.)

diction includes both, it may be ineffective as to the one covered; for the Commission then might lack the necessary means of obtaining or checking upon information (cf. § 21) necessary to ascertain the existence of a discrimination or to take other action commanded by the statute. Moreover, some of the practices forbidden appear to be peculiarly if not exclusively susceptible of commission or inducement by forwarders, brokers and shippers' agents, all specifically mentioned in the section.

The purpose of § 17,[10] in relevant part, is to provide for the establishment, observance and enforcement of just and reasonable regulations and practices relating to or in connection with the receiving, handling, storing or delivering of property. By the nature of their business, independent forwarders are intimately connected with these various activities. Here again, unless the Commission has jurisdiction over them, it may not be able effectively to carry out the policy of the Act.

Section 20,[11] which for the most part was copied from § 15 (11) of the Interstate Commerce Act, forbids the

---

[10] ". . . Every such carrier *and every other person subject to this Act shall* establish, *observe,* and enforce *just and reasonable regulations and practices relating to or connected with the receiving, handling, storing, or delivering of property.* Whenever the board [commission] finds that any such regulation or practice is unjust or unreasonable it may determine, prescribe, and order enforced a just and reasonable regulation or practice." 39 Stat. 734; 46 U. S. C. § 816. (Emphasis added.)

[11] "That it shall be unlawful for any common carrier by water *or other person subject to this Act,* or any officer, receiver, trustee, lessee, agent, or employee of such carrier or person, *or for any other person authorized by such carrier or person to receive information, knowingly to disclose* to or permit to be acquired by any person other than the shipper or consignee, without the consent of such shipper or consignee, any information concerning the nature, kind, quantity, destination, consignee, or routing of any property tendered or delivered to such common carrier *or other person subject to this Act* for transportation

disclosure of confidential information by a common carrier by water or other person,[12] when the information might be used to the detriment or prejudice of a shipper or consignee, or of a carrier, or might improperly disclose his business transactions to a competitor.

Finally, § 21, which is immediately involved in this case, requires the filing of reports, records and documents relating to the business of persons subject to the Act.

The intimate relationship of the forwarder to both shipper and carrier, essentially that of go-between, gives him not only unique sources of information, perhaps in its totality available to no one else, but also unique opportunity to engage in practices which the Act contemplates shall be subject to regulation, some of which we have emphasized in quoting the statutory provisions. The statute throughout is drawn in very broad terms. It forbids direct or indirect accomplishment of the outlawed acts. It broadly covers specific practices, including false billing, classification, weighing, and the manner of placing insurance, § 16, as well as general practices resulting in forbidden evils, §§ 15, 17, which forwarders, affiliated or independent, are favorably placed to bring about. It mentions forwarders specifically, not only in § 1, but elsewhere, e. g., § 16, without suggestion of distinction be-

in interstate or foreign commerce, which information may be used to the detriment or prejudice of such shipper or consignee, or which may improperly disclose his business transactions to a competitor, or which may be used to the detriment or prejudice of any carrier; and it shall also be unlawful for any person to solicit or knowingly receive any such information which may be so used." 39 Stat. 735; 46 U. S. C. § 819. (Emphasis added.) Exceptions are made for disclosure in response to legal process, etc.

[12] Section 15 (11) of the Interstate Commerce Act, 49 U. S. C. § 15 (11), does not contain the "other person" provision. The coverage of the two sections, however, is so broad that it probably would include forwarders even though they were not within the coverage of other sections.

tween independent and affiliated operators. To include the latter but exclude the former would be incongruous, not only for want of any such explicit suggestion, but because inclusion of one without the other would create a statutory discrimination tending in time to force out the affiliated forwarder and, with that achieved, to remove forwarding entirely from the reach of the regulatory plan. We do not believe that Congress had in mind such a self-defeating scheme. Almost as well might it have exempted all forwarders in the first place. Nor do we think the design of the Act was merely by indirection to forbid carriers or their affiliates to act as forwarders.

The legislative history clearly supports this view, although for explicit statement it is scanty. No discussion concerning the meaning of "any person [not a carrier] carrying on the business of forwarding . . . in connection with a common carrier by water" appears except in the statement of the manager of the bill in the House of Representatives.[13] When dealing with the breadth of the term "other person subject to this act," he said: "Hence, if this board [the United States Shipping Board] effectually regulates water carriers, it must also have supervision of all those incidental facilities connected with the main carriers . . . ." 53 Cong. Rec. 8276. Certainly this language is not indicative of intent to give a narrowly restricted scope to the definition's coverage. Quite the opposite is its effect.

The more significant legislative history, however, appears in the metamorphosis which this provision of § 1 underwent during the process of enactment. A predecessor bill (H. R. 14337, 64th Cong.) worded the definition as follows:

"The term 'other person subject to this Act' means any person not included in the term 'common carrier

---

[13] Representative Alexander, then Chairman of the Committee on the Merchant Marine and Fisheries.

by water' and carrying on the business of forwarding, *ferrying, towing,* or furnishing *transfer, lighterage,* dock, warehouse, or other terminal facilities *in or in connection with the foreign or interstate commerce of the United States."* (Emphasis added.)

As this was revised in the bill which was enacted (H. R. 15455, 64th Cong.), two changes occurred, apart from adding explicit mention of wharfage as among the terminal services. One was to eliminate the words "ferrying, towing . . . transfer, lighterage." The other was to substitute *"in connection with* a common carrier by water" for *"in or in connection with* the foreign or interstate commerce of the United States."

Had this latter wording been retained there could not have been the remotest basis for suggesting that independent forwarders were not covered, as there could have been none with reference to any of the other businesses or services mentioned. But, for a reason wholly unrelated to narrowing the class of forwarders and others not carriers who had been included, the original concluding phraseology was changed. That language was obviously inexact when applied, as the Shipping Act did apply, to carriage by water and incidental activities. Taken literally, the broad wording would have included forwarders and others furnishing terminal facilities in connection with shipments by rail. Obviously it was to eliminate this incongruity, and not to constrict the classes of "other persons" previously enumerated, that this change was made.

That it had no other purpose appears, moreover, from the elimination of "ferrying, towing . . . transfer, lighterage," which shows that when Congress wished to cut down the classes originally covered it did so attentively and explicitly. These eliminated persons were included originally, along with forwarders and others, not simply

to reach affiliates of carriers, but broadly to provide "for equal treatment to all shippers and water carriers by transfer and lighterage concerns *when forming a link in interstate or foreign commerce*." [14] (Emphasis added.) Nothing in the hearings, the committee reports, or the debates, upon the original or the substituted bills,[15] suggests either an original intention to restrict to carrier affiliates the coverage of forwarders or other furnishers of terminal or "link" service or a later intention to change the initial broad coverage by so restricting it. Silence so complete cannot be taken as the voice of change. The original congressional purpose clearly was to reach all who carry on the specified activities, whether in or out of affiliation with a carrier. That purpose remained unaltered by anything which took place in the course of transition from the first to the final form in which the bill was enacted.

Indeed, we held as much in the cases of *California* v. *United States* and *Oakland* v. *United States, supra.* The decision was that the Commission has jurisdiction over state and municipally owned businesses furnishing terminal facilities. The ruling would include *a fortiori* pri-

[14] H. Rep. No. 659, 64th Cong., 1st Sess., 32. It is true that no comparable explicit statement appears concerning forwarding or terminal activities. But in the absence of distinguishing language, the original coverage of "ferrying, towing . . . transfer, lighterage" hardly can be taken to have been broader, as respects affiliation, than "forwarding or furnishing wharfage, dock, warehouse, or other terminal facilities . . . ."; and the elimination of the former cannot be said to have restricted the latter in this respect or, in view of the decision in the *California* and *Oakland* cases, to have singled out forwarding alone for such restriction.

[15] Hearings on H. R. 14337 before the House Committee on the Merchant Marine and Fisheries, 64th Cong., 1st Sess.; Hearings on H. R. 15455 before the Senate Subcommittee on Commerce, 64th Cong., 1st Sess.; H. Rep. No. 659, 64th Cong., 1st Sess.; S. Rep. No. 689, 64th Cong., 1st Sess.

vately owned independent businesses of the same type. It would be a strange reading of the "other person" provision if forwarders alone were required to be affiliated in order to come within its terms, all others covered in both the original and the final forms of the legislative proposals being either independent or affiliated. Yet this is, in effect, appellees' exact contention and the view taken by the District Court. As has been noted,[16] that court misconceived the facts in the *Oakland* case and thus perhaps, at the time of entry of its final order, the full scope and effect of our decision.[17] At any rate, since Congress has indicated no intention to single out forwarders for regulation only when they are affiliated with a carrier, while at the same time broadly covering terminal operators and others, we are not free to inject such a distinction.

What has been said disposes of the principal contentions and issues. Appellees however offer other arguments, founded chiefly in the absence of prior established administrative practice,[18] but also in the history

---

[16] See note 5.

[17] The District Court's opinion, 55 F. Supp. 682, was filed November 30, 1943, and refers to the *California* case, but it makes no reference to the *Oakland* case, although both were then pending here. The court's further opinion, filed March 8, 1944, upon the motion for reargument, makes no reference to either of these cases. The findings of fact and conclusions of law were filed November 30, 1944, and judgment was entered the same day, nearly eleven months after our decision in the *California* and *Oakland* cases had been announced on January 3, 1944. As has been stated, see note 5, in the *Oakland* case, except in one instance, there was no showing of affiliation with a carrier, whether by continuing agreement or otherwise.

[18] It is pointed out that until the present proceeding neither the United States Maritime Commission nor its predecessor, the United States Shipping Board, attempted to exercise jurisdiction over forwarders such as the appellees. See, however, Fifth Annual Report of the United States Shipping Board, p. 75; Seventeenth Annual Report of the United States Shipping Board, p. 10. It is not to be inferred however that either of those bodies held the view that they were with-

of interstate commerce legislation affecting nonwater transportation and in decisions relating to that legislation.[19] We regard these considerations as inapposite to the problem raised by this case in connection with the quite different, wording, coverage, history and, to some extent, policy of the Shipping Act, for reasons already set forth in part and for others briefly indicated in the marginal notes attached to this paragraph.[20]

out such jurisdiction or that, if either did, that fact would be conclusive. An administrative agency is not ordinarily under an obligation immediately to test the limits of its jurisdiction. It may await an appropriate opportunity or clear need for doing so. It may also be mistaken as to the scope of its authority. Cf. *Social Security Board* v. *Nierotko*, 327 U. S. 358.

Although failure to exercise power may be significant as a factor shedding light on whether it has been conferred, see *Federal Trade Commission* v. *Bunte Bros.*, 312 U. S. 349, that fact alone neither extinguishes power granted nor establishes that the agency to which it is given regards itself as impotent. The present case, by virtue of differences from that of *Bunte Bros.* relating to the clarity and definiteness of the statute's terms, the policy of the Act, and the legislative history, is one which falls within the pronouncement: "Authority actually granted by Congress of course cannot evaporate through lack of administrative exercise." 312 U. S. at 352.

[19] Appellees strongly urge that this case is governed by the construction of the phrase "in connection with transportation" in the Interstate Commerce Act, cited and discussed in the text above (see *Lehigh Valley R. Co.* v. *United States*, 243 U. S. 444), and for this view rely upon *United States Navigation Co.* v. *Cunard S. S. Co.*, 284 U. S. 474, 481, which held that the Shipping Act and the Interstate Commerce Act, "each in its own field, should have like interpretation, application and effect." As we have stated, the phrase "connected with transportation," in the entirely different setting of the Interstate Commerce Act, is so dissimilar in terms and setting to the phrase "in connection with a common carrier by water" as used in the Shipping Act that the interpretation of the former cannot be controlling in determining the meaning of the latter.

[20] Appellees' contentions that there was no evidence to support a finding by the Commission that they were engaged in the business of forwarding "in connection with" a common carrier by water and

It remains only to notice the further objections that the case does not involve the use of forwarders by carriers to evade regulations applicable to carriers; and that to hold independent forwarders "subject to this Act" will bring them under its regulatory provisions, in other words, will make them "subject to this Act."

Needless to repeat, it is precisely because we think the latter effect is required by the considerations already set forth that our conclusion has been reached. Moreover, support for it is given by the very terms of the specific regulatory provisions cited to contradict it, as we have pointed out.[21] The ground need not be traversed again. The cited provisions, like § 1, are broad and general. They strike at evils as likely to be perpetrated by independent forwarders as by any of the "other persons" admittedly covered by the Act. They afford no suggestion of application narrowed to affiliated forwarders or of other distinction between them and independent forwarders, such as invariably and in the clearest terms Congress has stated whenever it has dealt with forwarders by land.

The common sense of all this, of course, is that Congress knew what it was about in both instances. We cannot ignore its repeated demonstrations of that fact. To do so would be to rewrite the statute, injecting limitations of affiliation no more rightfully within our function than inserting others of physical participation in the transportation service proper or of financial responsibility for it. These admittedly cannot go in, although there would be as much warrant for adding them as for putting in affiliation.

---

that the District Court erroneously refused to set aside the order of August 21, 1942, are founded in their view that the Act requires affiliation. For this and other reasons it is not necessary to consider them further.

[21] See notes 7, 9, 10, and discussion in the text.

Statutes may be emasculated as readily and as much by unauthorized restricted reading as by one unduly expansive. And the wisdom of the regulation of forwarders with the corresponding restriction of competitive freedom in the business is the concern of Congress, not of this Court. We leave the statute as Congress enacted it.

It is inherent in the view we take of the statute that more is involved than merely a carrier's attempt to immunize itself against the Act's penalties by using a forwarder to evade the regulations made binding on carriers. In that respect forwarders are obviously no different from other persons, for the Act does not permit such evasion by a carrier whether through the use of forwarders or any other persons. What is more important is that the Act is designed and in terms undertakes not only to prevent such evasion by carriers through denying them immunity when they hide behind forwarders; it also denies immunity to the forwarders themselves when they commit the acts or practices carriers and others subject to the Act are forbidden to perform.

The judgment is reversed and the cause is remanded for further proceedings in conformity with this opinion.

MR. JUSTICE JACKSON took no part in the consideration or decision of this case.

MR. JUSTICE FRANKFURTER dissenting, with whom MR. JUSTICE BLACK and MR. JUSTICE DOUGLAS concur.

It is important to keep in mind what this case is not. It does not involve the power of the Maritime Commission to obtain from a forwarder all information relevant to any inquiry by the Commission, based on complaints of violations of the Shipping Act or on its own motion. Section 27 of that Act gives the Commission such subpoena powers and subjects every person, forwarder or

not, to testimonial compulsion. 39 Stat. 728, 737, 46 U. S. C. § 826. Nor does the case involve the attempt of a carrier to use a forwarder as a means of evading the regulations by which water carriers are controlled. By no such indirection can a carrier immunize itself against the Act's penalties. Compare *Lehigh Valley R. Co.* v. *United States,* 243 U. S. 444.

The case is this. The business of these appellees is to negotiate on behalf of shippers for shipping space and to make the necessary administrative arrangements for the carriage of goods. They have no part in the physical process of moving goods. They have no corporate, physical, or financial tie with the carriers. The sole question here is whether such business has been brought under the regulatory scheme of the Act. The Commission contends that they are "persons subject to the Act." If the Commission is correct, these forwarders would have to submit all sorts of agreements with carriers and with other forwarders to the Commission for approval (39 Stat. 733, 46 U. S. C. § 814), whereupon such agreements may be freed from the restrictions of the Sherman Law; they would be required to maintain uniform rates (39 Stat. 734, 46 U. S. C. § 815); they would be subject to the Commission's supervision insofar as their activities involved practices pertaining to the handling and care of shipments (39 Stat. 734, 46 U. S. C. § 816); they would have to file reports and business records called for by the Commission (39 Stat. 736, 46 U. S. C. § 820); they would be subject to the Commission's power to award reparations for violations of the Act (39 Stat. 736, 46 U. S. C. § 821); and they would be liable to heavy penalties (39 Stat. 734, 736, 738, 40 Stat. 900, 902, 46 U. S. C. §§ 815, 820, 831, 839).

The Shipping Act has been on the statute books since 1916. Yet not until 1942 did the agency charged with

the duty of enforcing the Act deem forwarders of this type to be covered by it. The scope of its legislation is, of course, for Congress to determine and not for the enforcing agency. Inaction, no matter how consistent and long-continued, cannot contract the reach of a statute. But much has properly been said about the important significance which attaches to the meaning given a statute by those whose duty it is to enforce it and who are deemed especially equipped to breathe life into inert language. Just as assumption of jurisdiction by an administrative agency for a long period of time goes a long way to prove that powers exercised were impliedly given, see *United States* v. *Midwest Oil Co.*, 236 U. S. 459, a consistent and unexplained failure to exercise power not obviously conferred by legislation may be equally persuasive that the power claimed was never conferred. It is not to be presumed that for decades officials were either ignorant of the duties with which Congress charged them or derelict in their enforcement.

A consideration of the language of the legislation in its proper setting makes it abundantly clear that the failure of the Commission and its predecessor for more than twenty-five years to exercise the authority which it now claims was due neither to ignorance nor to indifference. The explanation that would spontaneously occur to one for such administrative practice is, I believe, the right one: the power was not exercised because Congress did not grant it.

It is a fair generalization that Congress has never supplanted the forces of competition by administrative regulation until a real evil had, in the opinion of Congress, manifested the need for it. One turns in vain to the Congressional investigation which led to the Shipping Act, to the hearings on the bills which became that Act, to the reports on which it was based, to the experience under the

Act since its inception, as reflected in the reports of the Maritime Commission and its predecessor the Shipping Board, for any indication that the business of independent forwarders, like those in this case, was so conducted as to make their regulation appropriate either to curb practices themselves inimical to the public interest or to render effective the regulation of water carriers.

The Commission's claim of jurisdiction must rest on construction of the phrase "business of forwarding . . . in connection with a common carrier by water." 39 Stat. 728, 46 U. S. C. § 801. Whatever the "business of forwarding" may here mean, effect must be given to the qualifying phrase "in connection with a common carrier by water." If it is left without any appropriate function unless these independent forwarders are covered, it must be applied to them. But if ample scope can be given to the phrase without attributing to Congress such a sudden assumption of authority over independent forwarders although no need for taking such control had been revealed, we should avoid undue extension of language as part of our duty to give fair meaning to what Congress has said.

Abstractly it may be argued that "forwarding" was intended to cover only those activities which included the physical transportation or movement of goods from one place to another. *Cf. e. g.,* H. R. 9089, 9090, 9888, 76th Cong., 3d Sess. (1940); S. 3665, 3666, 4096, 76th Cong., 3d Sess. (1940). Support for such a restrictive meaning might be drawn from the fact that the "other persons" subject to the Act were those concerned with the physical handling of the goods. But such a construction would disregard the purpose of the statute. Again, the term may be said to cover only those businesses in which the forwarder assumes the liability for safe shipment of the goods from point of shipment to their desti-

nation. *Cf.* 56 Stat. 284, 49 U. S. C. Supp. V, § 1002 (a) (5) (B). Such a construction likewise does not harmonize with the aims of the statute. The most natural meaning of "forwarding" includes the business in which these appellees engage, namely, the rendering of administrative and brokerage services. *Cf.* H. R. Rep. No. 1682, 77th Cong., 2d Sess. (1942).

But Congress did not regulate "forwarders"; it regulated the "business of forwarding . . . in connection with a common carrier by water." When, then, is forwarding "in connection with a common carrier by water"? That term may mean a business or financial connection; it may mean a physical connection, *i. e.*, the mutual handling of goods; it may mean both. Or it may mean any share in the process of offering of goods for water shipment. This last construction would mean that the restriction could have been included only for the purpose of excluding forwarders like these but concerned with shipment by rail. Such is the Commission's essential argument, that the phrase is merely a saving clause against its application to forwarders dealing with land carriers. To suggest that such a roundabout method was used for the purpose of saying that this statute was not impliedly intended as an amendment to the familiar Interstate Commerce Act, 24 Stat. 379, 49 U. S. C. § 1, amendments to which have always been designated as such, the administration of which was vested with a different Commission, the Interstate Commerce Commission, and the subject matter of which was completely distinguishable in the very titles of the statutes, is to attribute a fanciful abundance of caution, and less than common sense to the draughtsman. If every forwarder dealing with water carriers was to be covered by the Act, the obvious way of covering them would have been simply to say "forwarders" without qualification. The Commission really asks us to disregard the duty of

courts to give effect to every phrase used by Congress. The construction which is now accepted means that "in connection with a common carrier by water" are perfectly superfluous words and are to be deleted.

Significance must be given to the qualification. What more reasonable than to hold that this phrase means those forwarders who are so closely tied to the business of the water carrier, by corporate, financial, or physical union, as to make regulation of them appropriate in order to control effectively the carriers with which they are affiliated? Such a forwarder is really a part of the process of carrying. Here the forwarders are closely connected not with the carrier but with the shipper.

That such construction respects Congressional purpose is reinforced by Congressional action regarding forwarders dealing with land carriers. When Congress, in 1942, first regulated such land-carrier forwarders, 56 Stat. 284, 49 U. S. C., Supp. V, § 1001, forwarders, having the same functions in relation to land traffic as these appellees do in relation to water-borne traffic, were not included. And yet it is argued that Congress thirty years ago asserted control over such forwarders concerned with water-borne traffic and forbade ordinary competition among them, though no basis in experience can account for such action by Congress.

*California* v. *United States,* 320 U. S. 577, involved a totally different situation. That case was concerned with wharves—facilities physically connected with water carriers. These were just as much the agents of the carrier as of the shipper; they formed an integral part of the carrier's business. As a matter of physical fact, the "connection" of these forwarders to a carrier is very different from the "connection" of wharf facilities to the carrier. Awareness of that fact was demonstrated by the specific omission, in the *California* opinion, of the term "for-

warder" in considering whether port facilities were "connected" with water carriers. See *California* v. *United States, supra,* at 586. The difference in fact and in business relation between the forwarders' "connection" in this case, constituting merely an aspect of the shipper-carrier relationship, and the "connection" in the *California* case, which normally involves a close business tie with the carrier, is vital and should be observed in applying a section in which Congress dealt compendiously with various enterprises outside of, but related to, the regulated functions of water carriers.