337 F.2d 289
 NEW YORK FOREIGN FREIGHT FORWARDERS AND BROKERS ASSOCIATION,
Inc., Inge and Company, Inc., Barr Shipping
Company, Inc., Major Forwarding Company,
Inc., and John H. Faunce,
Inc., Petitioners,
v.
FEDERAL MARITIME COMMISSION and United States of America,
Respondents, Philadelphia Freight Brokers, Forwarders and
Custom Brokers Association, Inc., Baltimore Custom House
Brokers and Forwarders Association, Foreign Commerce Club of
Boston, Inc., and Export and Import Forwarding Association
of Virginia, Interveners.
NATIONAL CUSTOMS BROKERS & FORWARDERS ASSOCIATION OF
AMERICA, Inc., Petitioner,
v.
FEDERAL MARITIME COMMISSION and United States of America,
Respondents.
FARRELL SHIPPING CO., Inc., Farrell Bros. Brokerage, Inc., Petitioners,
v.
FEDERAL MARITIME COMMISSION and United States of America, Respondents.
 Nos. 34-36, Dockets 28229, 28306, 28307.
 United States Court of Appeals Second Circuit.
 Argued Sept. 23, 1964.
Decided Oct. 14, 1964.
 
 Gerald H. Ullman, Francis J. Haley, New York City, for petitioners in No. 28229.
 James F. Young, Philadelphia, Pa., (Eugene R. Lippman, Mark D. Alspach, Krusen, Evans & Byrne, Philadelphia, Pa., on the brief), for interveners in No. 28229.
 Charles S. Haight, of Haight, Gardner, Poor & Havens, New York, N.Y. (Thomas K. Roche, Sanford C. Miller, New York City, William F. Faison, on the brief), for petitioner in No. 28306.
 Donald D. Webster, of Hogan & Hartson, Washington, D.C., for petitioners in No. 28307.
 Jerome B. Blum, of Federal Maritime Commision, Washington, D.C. (James L. Pimper, Gen. Counsel, Robert E. Mitchell, Deputy Gen. Counsel, William H. Orrick, Jr., Asst. Atty. Gen., Arthur J. Murphy, Jr., Robert B. Hood, Jr., Dept. of Justice, on the brief), for respondents.
 Before MOORE, SMITH and KAUFMAN, Circuit Judges.
 KAUFMAN, Circuit Judge:
 
 
 1
 In these consolidated appeals ocean freight forwarders, individually and through trade associations,[1] question the validity of six regulations issued by the Federal Maritime Commission. The regulations, which implement the Freight Forwarder Law of 1961, 75 Stat. 522, 46 U.S.C. 801, 841a, 841b, generally concern 'brokerage' payments from ocean carriers to forwarders and the forwarders' methods of billing shippers.
 
 
 2
 Our discussion of the regulations will be clearer if the duties of a forwarder are first brought into focus. Most American exporters use the services of ocean freight forwarders who, in essence, act as export departments for their shipper clients. An exporter who ships goods abroad customarily consigns the merchandise to a forwarder who then makes all arrangements for dispatch to a foreign port. Thus, the forwarder will secure cargo space with a steamship company, give advice on governmental licensing requirements, proper port of exit and letter of credit intricacies, and arrange to have the cargo reach seaboard in time to meet the designated vessel. The forwarder also prepares required shipping documents, including the dock receipt, delivery order, bill of lading, export declaration and the consular invoice required on shipments to certain countries.
 
 
 3
 Often the forwarder performs so-called accessorial services, such as arranging insurance either under his own policy or the exporter's open marine policy. He may provide for local trucking of less than carload parcels to the pier and occasionally he will store partial shipments. To reimburse himself for the cost of arranging these accessorial services the forwarder charges the shipper a fee greater than his actual disbursement.
 
 
 4
 Most forwarders receive their revenues from two sources. They are paid by shippers for the various forwarding services performed and on many shipments forwarders receive, in addition, brokerage payments from ocean carriers.
 
 
 5
 Despite the forwarders' valuable role in relieving exporters of the many details and formalities of foreign trade and facilitating the flow of water-borne commerce, certain activities within the industry have been scrutinized by public agencies and found objectionable. Criticism has focused primarily on the forwarders' activities as brokers and the payments received for such brokers' services from ocean carriers as well as the forwarders' methods of billing shippers.
 
 
 6
 The history of public investigation begins in 1942 when the Maritime Commission instituted a probe, under the 1916 Shipping Act, 39 Stat. 728, 46 U.S.C. 801, into the propriety of forwarder practices at the Port of New York. The proceedings were temporarily sidetracked when the forwarders challenged the agency's statutory authority to regulate their industry's activities. The Maritime Commission's jurisdiction was upheld in United States v. American Union Transport, Inc., 327 U.S. 437, 66 S.Ct. 644, 90 L.Ed. 772 (1946), when the Supreme Court concluded that foreign freight forwarders, even though not contractually or corporately affiliated with a common carrier by water, are subject to the Shipping Act's regulatory provisions.
 
 
 7
 The Court pointed out that forwarders are 'agents of the shipper,' intimately related to both shipper and carrier as a 'go-between,' and that 'considerations of policy and history' called for their inclusion within the regulatory scheme. 327 U.S. at 443, 445, 450, 66 S.Ct. 644. In Mr. Justice Rutledge's words:
 
 
 8
 'Section 16 forbids various forms of discrimination, as well as other practices, on the part of any common carrier by water 'or other person,' which an independent forwarder readily may commit or induce. * * * Some of the practices forbidden appear to be peculiarly if not exclusively susceptible of commission or inducement by forwarders, brokers and shippers' agents, all specifically mentioned in the section.
 
 
 9
 'The purpose of 17, in relevant part, is to provide for the establishment, observance and enforcement of just and reasonable regulations and practices relating to or in connection with the receiving, handling, storing or delivering of property. By the nature of their business, independent forwarders are intimately connected with these various activities. Here again, unless the Commission has jurisdiction over them, it may not be able effectively to carry out the policy of the Act.' 327 U.S. at 447-449, 66 S.Ct. at 649-650.
 
 
 10
 After the Supreme Court's decision the Maritime Commission completed its investigation, Port of New York Freight Forwarder Investigation, 3 U.S.M.C. 157 (1949), and on May 18, 1950, issued regulations governing forwarder billing practices, special contracts between forwarders and shippers or consignees, and brokerage payments. 46 C.F.R. Part 244. In 1954 the agency began a second broad study of the forwarding industry. Some seven years later, on June 29, 1961, a comprehensive report was published, together with regulations to become effective after 120 days. Investigation of Practices, Operations, Actions, and Agreements of Ocean Freight Forwarders, 6 F.M.B. 327.
 
 
 11
 In the course of these extensive probes the maritime agency uncovered certain disturbing improprieties in forwarder billing methods; charges for accessorial services, for example, were marked up 'in a random fashion.' The 1961 report concluded that 'discrimination, preference, and prejudice is the rule' in the assessment of forwarder charges and is unlawful absent justification. Accordingly, the 1950 regulations were modified 'to prohibit the assessment of disguised markups in all instances which are shown on this record to result in violation of sections 16 and 17 of the Act.' 6 F.M.B. at 359, 365.
 
 
 12
 The agency also investigated and analyzed brokerage payments from carriers to forwarders. After pointing out that forwarders are engaged by shippers to carry out shipper responsibilities, the Commission held that forwarders are generally not brokers in their relations with carriers. Nevertheless, according to the study, the carriers paid brokerage fees without ascertaining whether the forwarders had performed any services and without determining if forwarder-shipper relationships would make the payments illegal rebates under section 16. Having concluded that brokerage fees led forwarders to discriminate among shippers in violation of sections 16 and 17 of the Shipping Act, the agency resolved to prohibit brokerage payments covering cargo with respect to which forwarding services had been rendered.
 
 
 13
 Reaction from the freight forwarding industry followed swiftly and took the form of efforts to secure Congressional legislation which came to fruition in the Freight Forwarder Law, enacted September 19, 1961. 75 Stat. 522, 46 U.S.C. 801, 841a, 841b. Congress' remedy for the industry's malpractices stopped short of the agency's proposed total ban on brokerage payments. Instead, compensation from carriers was authorized only where the forwarder renders specified services of value and issues a certificate to that effect. Additionally, forwarders would be licensed and other safeguards provided to enable the Maritime Commission to cure the abuses and undesirable practices uncovered in its extensive investigations.
 
 
 14
 Under the 1961 Law a common carrier may 'compensate' a licensed forwarder 'when, and only when' he has performed certifies to the carrier that he has performed-- 'the solicitation and securing of the cargo for the ship or the booking of, or otherwise arranging space for, such cargo' plus at least two out of five additional enumerated services. 46 U.S.C. 841b(e). Moreover, a license is now required as a prerequisite to engaging in the forwarding business. 41 U.S.C. 841b(a). A forwarder licensee must be 'independent'-- free of any affiliation with a shipper, consignee, seller, purchaser of the shipment, or with any person having a beneficial interest in the goods, 46 U.S.C. 801-- in order to eliminate indirect rebates to shippers. Finally, the Maritime Commission is directed to prescribe 'reasonable rules and regulations' to be observed by forwarders. 46 U.S.C. 841a.
 
 
 15
 The Commission heeded this mandate and commenced a new rule-making proceeding. In December 1961 the agency issued regulations, without objection from the forwarders, setting forth the procedure for obtaining a forwarder's license. Shortly thereafter, in February 1962, proposed rules regulating the 'Practices of Independent Ocean Freight Forwarders, Ocean Freight Brokers, and Oceangoing Common Carriers' were published. After reviewing the comments of interested parties, the Commission revised some of the proposed rules and republished them in January 1963. Further comments were received and the Commission heard oral arguments respecting those rules challenged by the forwarding industry. Finally, by order dated April 2, 1963, published in the Federal Register of May 1, 1963, 28 Fed.Reg. 4300, the Maritime Commission gave notice that, after further revision, the proposed rules had been adopted and would become effective June 1, 1963. On May 21, 1963, the Commission denied petitions by freight forwarders to reconsider certain of the adopted rules.
 
 
 16
 Having exhausted their administrative remedies, the aggrieved freight forwarders filed petitions with this Court and the Court of Appeals for the District of Columbia Circuit seeking judicial review of six of the proposed regulations. On May 28, 1963, we issued an interlocutory injunction restraining the Commission from putting into effect the challenged rules until thirty days after the determination of this appeal. The District of Columbia proceedings have been transferred to this Court pursuant to 28 U.S.C. 2112(a), and the several cases have been consolidated. Our jurisdiction derives from the Administrative Orders Review Act, 64 Stat. 1129 (1950), 5 U.S.C. 1031-1042 (1958).
 
 
 17
 The six challenged regulations may be briefly summarized: (A) Section 510.21(1) defines a forwarder's 'beneficial interest' in shipments to include 'any lien interest' therein. (B) Section 510.22(a) prohibits a forwarder from collecting compensation from a carrier where the carrier performs part of the forwarding services. (C) Section 510.23(j) requires a forwarder to itemize or state separately on his bill his actual expenditures on the shipper's behalf as well as the charges or fees assessed for his own services. (D) Section 510.24(e) requires the forwarder to certify to the carrier, as to each shipment, which of the services specified in Section 44(e) of the 1961 Law he has performed. (E) Section 510.24(g) prohibits a licensed forwarder, and any person or firm in which he has a beneficial interest, from charging or collecting 'any compensation or brokerage' from a carrier with respect to non-bulk cargo, unless the forwarder has performed the minimum services specified in Section 44(e). (F) Section 510.25(a) provides that forwarders, upon reasonable request, must disclose to Maritime Commission personnel or bona fide shippers, special contracts or arrangements with shippers.[2]
 
 I.
 
 18
 Orderly procedure requires that we first define this court's limits in adjudicating the validity of the challenged regulations. In doing so we should consider the contentions respecting our scope of review. The New York Association maintains that the Maritime Commission's rule-making authority is limited to correcting practices found to violate the regulatory provisions of the 1916 Shipping Act. If, according to this view, a practice sought to be regulated is not contrary to a substantive provision of the 1916 Act, then, it is urged, the regulation is invalid. We do not agree with this restrictive view of the agency's powers.
 
 
 19
 Judge Frank capsulized the standards that govern our review in United States v. Obermeier, 186 F.2d 243 (2d Cir.1950), cert. denied, 340 U.S. 951, 71 S.Ct. 569, 95 L.Ed. 685 (1951). He wrote that '(1) A regulation is presumptively valid, and one who attacks it has the burden of showing its invalidity. (2) A regulation or administrative practice is ordinarily valid unless it is (a) unreasonable or inappropriate or (b) plainly inconsistent with the statute.' See also Grace Line, Inc. v. Federal Maritime Board, 263 F.2d 709, 711 (2d Cir. 1959). Michael Obermeier had been convicted for knowingly making a false statement under oath in an administrative, prenaturalization-petition examination. He claimed that he committed no crime because the oath was administered without explicit statutory authority. The court rejected this view, holding that the regulations, which went beyond the Naturalization Act in authorizing an oath in examinations held before filing a petition for naturalization, were 'eminently reasonable and appropriate.' 186 F.2d at 248. The Administrative Procedure Act, 10(e), 5 U.S.C. 1009, articulates the test in this fashion: agency rules may not be arbitrary, capricious or an abuse of discretion or unsupported by substantial evidence.
 
 
 20
 Our limited scope of review, established by judicial decisions and the A.P.A., is based on a realistic view of the legislative process. Congressional legislation does not undertake to deal with every specific evil for some are unforeseeable; instead Congress often creates an administrative agency to allow application of experts' familiarity with the problems involved. The Supreme Court carefully explained the necessary and proper function of agency rule-making in American Trucking Ass'ns, Inc. v. United States, 344 U.S. 298, 73 S.Ct. 307, 97 L.Ed. 337 (1953). The Interstate Commerce Commission had issued rules prohibiting short-term or trip-leasing by motor carriers. The Court held that promulgation of the rules was within the Commission's power, despite the absence of specific reference to leasing practices in the Motor Carrier Act. Mr. Justice Reed's words deserve quotation:
 
 
 21
 'All urge upon us the fact that nowhere in the Act is there an express delegation of power to control, regulate or affect leasing practices, and it is further insisted that in each separate provision of the Act granting regulatory authority there is no direct implication of such power. Our function, however, does not stop with a section-by-section search for the phrase 'regulation of leasing practices' among the literal words of the statutory provisions. As a matter of principle, we might agree with appellants' contentions if we thought it a reasonable canon of interpretation that the draftsmen of acts delegating agency powers, as a practical and realistic matter, can or do include specific consideration of every evil sought to be corrected. But no great acquaintance with practical affairs is required to know that such prescience, either in fact or in the minds of Congress, does not exist. National Broadcasting Co. v. United States, 319 U.S. 190, 219-220 (63 S.Ct. 997, 1010-1011, 87 L.Ed. 1344); Phelps Dodge Corp. v. (National Labor Relations) Board, 313 U.S. 177, 193-194 (61 S.Ct. 845, 852, 85 L.Ed. 1271). Its very absence, moreover, is precisely one of the reasons why regulatory agencies such as the Commission are created, for it is the fond hope of their authors that they bring to their work the expert's familiarity with industry conditions which members of the delegating legislatures cannot be expected to possess. United States v. Pennsylvania R. Co., 323 U.S. 612 (65 S.Ct. 471, 89 L.Ed. 499).' (344 U.S. 298, 309-310, 73 S.Ct. 307, 314.)
 
 
 22
 The New York Association also suggests that the rules do not contain 'a concise general statement of their basis and purpose' in compliance with Section 4(b) of the Administrative Procedure Act, 5 U.S.C. 1003(b). But the order promulgating the rules meets the statutory requirement in stating that they implement the 1961 Law 'and have for their purpose the establishment of standards and criteria to be observed and maintained by licensed independent ocean freight forwarders, ocean freight brokers and oceangoing common carriers in the conduct of their business affairs.'
 
 
 23
 Finally, we cannot ignore the Maritime Commission's responsibility to enforce the overall objectives of the 1916 Shipping Act. Mr. Justice Frankfurter defined the broad scope of this obligation in State of California v. United States: 'Finding a wrong which it is dutybound to remedy the Maritime Commission, as the expert body established by Congress for safeguarding this specialized aspect of the national interest, may, within the general framework of the Shipping Act, fashion the tools for so doing.' 320 U.S. 577, 584, 64 S.Ct. 352, 356, 88 L.Ed. 322 (1944). The same thought was expressed more recently:
 
 
 24
 'The great complexity of our economy induced Congress to place the regulation of businesses like foreign shipments in specialized agencies with broad powers. The courts are slow to interfere with the conclusions of such agencies when reconcilable with statutory directions.' American Union Transport, Inc. v. United States, 103 U.S.App.D.C. 229, 257 F.2d 607, 612, cert. denied, 358 U.S. 828, 79 S.Ct. 46, 3 L.Ed.2d 67 (1958).
 
 II.
 
 25
 With this background we now consider whether the six challenged regulations are reasonable and consistent with the authority granted in the 1916 Shipping Act and the 1961 Freight Forwarder Law.
 
 A. Section 510.21(l)
 
 26
 Section 1 of the 1916 Shipping Act, as amended by the Freight Forwarder Law of 1961, defines an 'independent ocean freight forwarder' as 'a person carrying on the business of forwarding for a consideration who is not a shipper or consignee or a seller or purchaser of shipments to foreign countries, nor has any beneficial interest therein, nor directly or indirectly controls or is controlled by such shipper or consignee or by any person having such a beneficial interest.' 46 U.S.C. 801. Licensed forwarders must be truly independent of shippers and not have any beneficial interest in shipments in order to prevent the illegal rebating that occurs when brokerage is received by forwarders who are also shippers, shipper-owned or shipper-connected, or who have a beneficial interest in shipments. To fulfill this objective Rule 510.21(1) defines 'beneficial interest' to include 'any lien interest' of a forwarder 'arising by the financing of the shipment.'
 
 
 27
 The New York Association argues that the rule is unlawful because it seeks to regulate forwarder financing activities which do not violate any provision of the Shipping Act. But Congress by its legislation in 1961 rejected this contention, and showed a clear intention to separate forwarders completely from all shipper interests. Legislation proposed by the forwarder industry sought to define 'beneficial interest' to exclude a lien interest. However, the phrase 'other than a lien,' urged upon Congress by the forwarders, was deleted from the words 'beneficial interest therein other than a lien' submitted by them. Congress apparently accepted the agency's position that 'a lien on a shipment could give a freight forwarder sufficient beneficial interest in the shipment to cause payments thereon by the carrier to the forwarder to be a form of indirect rebate of the freight.' Senate Report No. 691, 87th Cong., 1st Sess., p. 4, U.S.Code Cong. and Adm. News 1961, p. 2702. We are not convinced that this legislative history should be ignored simply because of the suggestion that the urgent need for new legislation led the industry to accept the change without objection.
 
 
 28
 It is interesting that the rule also provides that 'any obligation arising in favor of a licensee by reason of advances of out-of-pocket expenses incurred in dispatching of shipments shall not be deemed a beneficial interest.' We find the distinction thus drawn between a lien arising from financing and one created by a forwarder's out-of-pocket expenses eminently reasonable. The forwarder routinely incurs out-of-pocket expenses in carrying out his functions for the shipper; he is usually reimbursed soon after the goods reach their destination. Indeed, the 1961 Law expressly lists 'payment of the ocean freight charges' as a function a freight forwarder may perform and a basis for his receipt of compensation. 46 U.S.C. 841b(e)(5). On the other hand, the financing of export shipments belongs primarily to the exporter or a financial institution, not to the independent ocean freight forwarder.
 
 
 29
 Although the challenged rule may limit some benign financing activities by forwarders, it provides a means to curb an evil Congress sought to correct-- the collection of compensation from carriers by persons who have any interest in the goods being shipped. We hold that the rule is reasonable and necessary to prevent forwarders from selling goods under the guise of 'financing' and then using this subterfuge to receive a discounted freight rate.
 
 B. Section 510.22(a)
 
 30
 The contested portion of this rule provides that 'No licensee may charge or collect compensation in the event he requests the carrier or its agent to perform any of the forwarding services set forth in * * * (section 44 of the 1961 Law) unless no other licensee is willing and able to perform such services.' The Maritime Commission thereby seeks to prohibit a forwarder from collecting compensation from a carrier if the carrier, at the forwarder's request, has performed part of the freight forwarding service.[3]
 
 
 31
 The New York Association urges that the rule is contrary to the 1961 Law because it may deprive a forwarder of compensation even though he has rendered sufficient services under section 44(e). The forwarders direct our attention to the absence of specific statutory language prohibiting the rendering of free services by carriers in addition to the payment of brokerage. But this narrow approach ignores the Commission's responsibility to enforce the broad objectives of the Shipping Act of 1916.
 
 
 32
 We find Section 510.22(a) reasonable and necessary to prevent the erosion of the freight forwarder industry at ports other than New York. The rule seeks to prevent forwarders in the larger ports, who control cargo routing, from bypassing forwarders in the lesser ports. The development and free flow of this nation's foreign commerce requires that local freight forwarders be available at all ports; achievement of that goal will be frustrated if carriers or their agents perform services at the lesser ports for forwarders located in New York.
 
 
 33
 The forwarding industry's history fully supports this conclusion. Absent the challenged regulation, the New York forwarders, because of their power to control cargo routing, can and do manipulate freight to the lesser ports in order to have the carriers perform services, without charge, normally executed by a forwarder. This practice deprives the lesser-port forwarders of fees; at the same time there is no reciprocity for these forwarders in New York. In its 1961 report the maritime agency wrote that:
 
 
 34
 'In order to avoid, where possible, the necessity of splitting brokerage payments, the New York forwarders have * * * entered into arrangements with the ocean carriers under which the work necessary to complete forwarding services * * * is accomplished by the ocean carriers without charge at ports such as Boston and Baltimore, and * * * Charleston and Savannah. Pursuant to these arrangements, the New York forwarders have diverted cargo from New Orleans to Savannah and Charleston in order to avoid the splitting of brokerage with New Orleans forwarders, because carriers have refused to perform outport forwarding services * * * at New Orleans. The forwarders at Boston and Baltimore have requested that the carriers discontinue their performance of free forwarding services for the New York forwarders, or alternatively that like services be performed at New York on behalf of the Boston and Baltimore forwarders, but these requests have been refused. 6 F.M.B. 327, 345.'
 
 
 35
 In this connection we note that the New York forwarders' approximately sixty percent share of the shipments handled by the industry, 6 F.M.C. 327, 337 (1961) seems grossly disproportionate when compared with the fact that export tonnage passing through New York in 1961 was only twenty percent of the combined export tonnage of Boston, Philadelphia, Baltimore, and Norfolk-Newport News. 1963 Statistical Abstract of the United States, p. 600.
 
 
 36
 The challenged rule represents a reasonable effort by the Maritime Commission to fulfill its affirmative duty to implement the national maritime policy. Section 44(b) of the Shipping Act, 46 U.S.C. 841b(b), establishing the licensing requirement for freight forwarders, requires 'that the proposed forwarding business is, or will be consistent with the national maritime policies declared in the Merchant Marine Act, 1936.'[4] We recognize the importance of the ocean freight forwarding industry to the American economy; without the industry's services, our vital export trade would be at a serious disadvantage in the intense competition of world commerce. It is equally important that the forwarding industry flourish at the lesser ports to insure maximum utilization of all shipping routes to our trading associates in all corners of the world. Rule 510.22(a) is reasonable and necessary to prevent the New York forwarders from using their position of power to stifle forwarders at Boston, Philadelphia, Baltimore and Norfolk.
 
 C. Section 510.23(j)
 
 37
 In substance, this rule requires a licensed forwarder to itemize or state separately in billing exporters the actual expenditures made on the shipper's behalf as well as the fees assessed for his own services. Traditionally, the invoices of New York forwarders showed as one item the total charge for accessorial services such as procuring insurance, warehousing or cartage. This charge included the forwarder's costs as well as his fee for arranging the service. The Maritime Commission believes that the proposed rule is necessary to prevent freight forwarders from using these billing methods to mark up insurance and accessorial charges indiscriminately.
 
 
 38
 The forwarders suggest that the rule will cause them to lose the gross profit customarily received in arranging for accessorial services, a loss they claim will seriously affect the profitability of their operations. They argue that the practice of including the disbursement and service fee as one item on the invoice to the shipper does not violate either Section 16 or Section 17 of the Shipping Act. Section 16 (First), 46 U.S.C. 815, makes it unlawful for any forwarder to give an undue or unreasonable preference or advantage to one person or to subject a person to any undue or unreasonable prejudice or disadvantage. We agree with the Commission that substantial evidence before it indicated the traditional billing methods lead to discriminatory practices outlawed by Section 16 (First); we therefore find it unnecessary to consider whether Section 510.23(j) is necessary to eliminate purported violations of Section 17.
 
 
 39
 It is true, as the New York Association argues, that there is no discrimination in the sense that some shippers are billed differently, for all bills treat the disbursement and service fee as one item. But this very method permits forwarders to discriminate in the amount of the charges levied against shippers. In its 1949 report the Maritime Commission noted:
 
 
 40
 'The most common abuses arise from the forwarders' methods of billing-- the failure to specify clearly and state separately all service charges, and to segregate them from actual out-of-pocket costs for accessorial services * * * This practice is unjust and unreasonable. Port of New York Freight Forwarder Investigation, 3 U.S.M.C. 157, 163 (1949).'
 
 
 41
 In 1961 the agency again concluded that markups 'are imposed in a random fashion, vary from shipper to shipper and from shipment to shipment, and appear to bear no relation to the cost to the forwarder for his services of placing the insurance.' Investigation of Practices, Operations, Actions, and Agreements of Ocean Freight Forwarders, 6 F.M.B. 327, 340-41 (1961). The Maritime Commission properly relied on these earlier findings in drafting Section 510.23(j). The agency's rule-making process is not conducted in an isolated vacuum but is a continuing one; evidence gathered in the past, so long as it is still relevant, may be useful in exploring solutions to present problems.
 
 
 42
 The forwarders argue that a Section 16 (First) violation is shown only when (1) two shippers are given unequal treatment, (2) the shippers are competitors, and (3) the preference to one or disadvantage to the other is the proximate cause of an injury; these prerequisites, they urge, are not supported by the Commission's record. We hold, however, that the substantial evidence that forwarders, in random fashion, charge shippers disguised markups of widely varying amounts, for no apparent reason, suffices to establish discrimination in violation of Section 16 (First). In urging that all three prerequisites must be met, the forwarders rely upon cases involving alleged discrimination in transportation or wharfage charges. See, e.g., Agreement 8765-Gulf/Mediterranean Trade, 7 F.M.C. 495 (1963); Wharfage Charges and Practices at Boston, Mass., 2 U.S.M.C. 245 (1940). We find those cases not apposite. Transportation or wharfage charges are dependent upon the particular commodity involved; the cost for shipping or storing bananas, for example, bears no relation to the fees levied for heavy industrial equipment. To find an unlawful discrimination in transportation charges thus quite properly requires a showing of competitive relationship between two shippers who are charged different prices. But forwarders render substantially the same service to all shippers in procuring insurance or arranging for cartage; the commodity being shipped has little or nothing to do with the reasonableness of the fee exacted for the forwarder's service. The very practice of charging shippers disguised markups of widely varying amounts on substantially identical services, without justification, seems to us to be prima facie discriminatory in a regulated industry. In any event, we do not believe competitive relationships must be shown to justify the prophylactic disclosure technique of Rule 510.23(j).
 
 
 43
 The New York Association argues that the proposed rule will not eliminate the supposed discrimination involved in assessing different charges for the same accessorial work. Requiring a forwarder to disclose his gross profit will not by itself, they urge, serve to prevent undue discrimination between similarly situated competitive shippers. But we cannot override the Commission's expert judgment that an informed shipping public will upon learning the factual details eliminate the discriminatory and unfair practices resulting from hidden charges for accessorial services. Our role as judges is limited to weighing the reasonableness of the experts' chosen means to eliminate a statutory violation.
 
 
 44
 Finally, the National Customs Brokers urge that the Commission should have adopted a more limited regulation requiring the forwarder to inform the shipper of the insured value, the insurance rate charged, and the fact that the forwarder may have charged the shipper for insurance at a rate over the forwarder's own cost. This proposed modification would not require the forwarder to disclose his premium cost when he has utilized his own open policy. But the seeming reasonableness of the Custom Brokers' proposal does not establish the unreasonableness of the Maritime Commission's regulation.
 
 
 45
 We therefore hold that the itemized billing requirement of Section 510.23(j) is reasonable and necessary to prevent discriminatory practices violative of Section 16 (First) of the Shipping Act.
 
 D. Section 510.24(e)
 
 46
 A licensed forwarder is required by this rule to certify to the carrier on each shipment for which compensation is claimed that he has solicited and secured the cargo, or booked it or arranged its space, and has performed at least two of the additional services enumerated in Section 44(e). The specificity required by the rule is intended to eliminate 'automatic' collection of brokerage payments and to permit the carrier to determine the value of the section 44 services actually rendered.
 
 
 47
 The New York Association prefers the present practice whereby a forwarder, to obtain compensation from a carrier, furnishes one invoice and one certificate covering all shipments a forwarder handles on a single vessel. The Association advocates a single, general certification which does not particularize the forwarder's services and may be used to cover an unlimited number of shipments. But the specific section 44 services performed by the forwarder will vary from shipment to shipment; a single, blanket certification for each voyage will reveal no more than a certification covering all shipments for a given month or even year. The Commission's proposed regulation is fully supported by Section 44(e)'s requirement that a forwarder certify that 'he performed the above specified services with respect to such shipment.'
 
 
 48
 Nor can we accept the Association's suggestion that the regulation will necessarily result in a 'mountain of paper work.' Only occasionally will additional documents be required-- often the forwarder will be able to certify his claim on existing documents, such as a bill of lading.
 
 
 49
 Finally, the Association doubts that the check-off provisions will serve a useful regulatory purpose. It notes that if the Maritime Commission suspects that a certification is false, it will still be necessary to call upon the forwarder to demonstrate that the minimum services required by the statute have been performed. Of course, investigation will still be required, but the very purpose of the proposed rule is to narrow the inquiry to whether the checked-off services were performed with respect to a particular shipment and to ease the difficulties in ascertaining a certification's conformity with the actual facts. A single or blanket certificate covering many shipments would make supervision difficult and invite evasion; we therefore hold that Section 510.24(e) represents a reasonable exercise of the Maritime Commission's enforcement authority.
 
 E. Section 510.24(g)
 
 50
 This rule provides that no forwarder, or person owned or controlled by such forwarder, may collect brokerage from an ocean carrier unless it has performed the statutorily enumerated services. When the original version of the rule was amended to exclude brokerage commissions on bulk cargo, all petitioners withdrew their objections except Farrell Shipping Co., Inc. and Farrell Bros. Brokerage, Inc.
 
 
 51
 The rule seeks to avoid wholesale evasion of Section 44(e) of the Shipping Act. That section is intended to avoid the evil of commission payments by carriers to forwarders where the forwarder has performed little or no service in connection with a shipment. It therefore provides, as we have already indicated, that a common carrier by water may compensate an ocean freight forwarder 'when and only when' the freight forwarder certifies that he is licensed and 'has performed with respect to such shipment the solicitation and securing of the cargo for the ship or the booking of, or otherwise arranging for space for, such cargo,' and at least two out of five additionally enumerated services. If licensed forwarders, or their alter egos, can collect brokerage commissions without certifying performance of the requisite number of services under section 44(e) simply by claiming they are acting as ocean freight brokers, section 44(e) will stand devoid of meaning. Rule 510.24(g) is, therefore, necessary to prevent a freight forwarder's alter ego from claiming brokerage as a freight broker whenever the forwarder itself cannot complete a section 44(e) certificate because the requisite services have not been performed. The rule does not regulate independent brokers, who are concededly not subject to regulation, but only limits a licensee's affiliations in order to prevent circumvention of the 1961 Act's limitations on the receipt of brokerage payments. See American Union Transport, Inc. v. United States, 103 U.S.App.D.C. 229, 257 F.2d 607, 612 (1958), cert. denied, 358 U.S. 828, 79 S.Ct. 46 (1959).
 
 
 52
 The challenged regulation directly affects the Farrell operation. Farrell Shipping Co. was registered with the Maritime Commission as a freight forwarder before the enactment of the 1961 Law. After that law was passed, Farrell Bros. Brokerage was incorporated to engage primarily in export freight brokerage and chartering brokerage activities. The two companies have common owners and occupy adjacent office facilities. But even if we accept Farrell's contention that Farrell Brokerage never charges a carrier a brokerage fee on cargo for which Shipping has acted as a freight forwarder, Rule 510.24(g) must be upheld. Regulations are not directed at the practices of a single corporation, nor are they vitiated by the fact that in attempting to curtail illegal activity by some persons limitations are also placed on assumedly legitimate activities of others. Rule 510.24(g) represents a reasonable and necessary effort to prevent those freight forwarders who are unable to give the certificate required by section 44(e) from charging ocean common carriers for an incomplete forwarding service by calling it a brokerage service.
 
 
 53
 We do not overlook Farrell's contention that it would have been more reasonable to require a broker to furnish a written statement under oath specifying the brokerage services performed and attesting that the brokerage charge is not made to avoid compliance with section 44(e). But we cannot reject the Commission's implicit determination that it would be too difficult, under such a rule, to regulate freight forwarders if their owners are permitted to operate separate businesses that charge for brokerage services. We, therefore, hold that Rule 510.24(g) is reasonable and necessary to insure that freight forwarders are compensated by ocean carriers only when the requisite section 44(e) services have been performed.
 
 F. Section 510.25(a)
 
 54
 If this rule is upheld, forwarders will be required, upon reasonable request, to disclose to Maritime Commission personnel or bona fide shippers special contracts or arrangements with shippers. The object is to assure non-discriminatory treatment by freight forwarders to similarly situated shippers seeking 'special contracts.' We need not agree with the Commission that 'the best way to assure nondiscriminatory treatment is to allow shippers to determine the rates at which freight forwarder services are being performed under special contracts for persons similarly situated.' F.M.C. No. 973, Denial of Petitions for Reconsideration, p. 7. It is sufficient that we find the rule a reasonable vehicle for enforcing compliance with Section 16's prohibition against a forwarder 'unduly or unreasonably preferring or discriminating against' any person.
 
 
 55
 We cannot accept the New York Association's argument that the regulation is unlawful because it requires disclosure of a confidential relationship and compels the forwarder to reveal information to a third party in violation of Section 20 of the Shipping Act, 46 U.S.C. 819. Section 20 makes it unlawful for any forwarder to disclose without the consent of his shipper any information concerning the nature, quantity, destination, consignee or routing of any shipment which may be used to the shipper's detriment or improperly disclose his business transactions to a competitor. Because the term 'special contract,' as defined in Section 510.21(j), is directed to the financial arrangements which may exist between forwarder and shipper, such as lump sum charges or monthly retainers, we cannot see how Section 510.25(a) will cause disclosure of the confidential business details mentioned in Section 20. Moreover, a forwarder's charges for his services can never be 'confidential,' given the public nature of his already carefully regulated calling. Smith v. Interstate Commerce Commission, 245 U.S. 33, 38 S.Ct. 30, 62 L.Ed. 135 (1917).
 
 
 56
 Finally, we note that the challenged regulation merely replaces one that required forwarders to 'advise' shippers of the terms under which they made 'special contracts or agreements' available to other shippers. General Order 72, 15 Fed.Reg. 3153, 244.9, 244.10 (1950). We are persuaded that this minor change is reasonable and necessary to effectuate the anti-discrimination provisions of the Shipping Act.
 
 
 57
 We conclude that the six challenged regulations are reasonable and necessary to implement the policy and objectives of the 1916 Shipping Act and the 1961 Freight Forwarder Law. The regulations are not in excess of the authority conferred by both statutes. We therefore affirm the Commission's order promulgating the regulations.
 
 
 
 [1]
 The regulations are challenged by the New York Foreign Freight Forwarders and Brokers Association, Inc., National Customs Brokers & Forwarders Association of America, Inc., Inge and Company, Inc., Barr Shipping Company, Inc., Major Forwarding Company, Inc., John H. Faunce, Inc., Farrell Shipping Co., Inc., and Farrell Bros. Brokerage, Inc. The New York Association is composed of approximately 110 ocean freight forwarders conducting their business primarily through the Port of New York. The members also do a substantial business in the other major ports of the United States, either through branch offices or corresponding forwarders. National Customs Brokers is a membership corporation with some 350 members located throughout the United States and some 200 members abroad
 
 
 [2]
 The challenged regulations appear in full at 28 Fed.Reg. 4300 (1963)
 The New York Association objects to all of the rules except Section 510.24(g). Farrell Shipping and Farrell Bros. Brokerage objects only to 510.24(g). National Customs Brokers contests only Section 510.23(j).
 On September 4, 1963, we granted leave to intervene to Philadelphia Freight Brokers, Forwarders and Custom Brokers Association, Inc., Baltimore Custom House Brokers and Forwarders Association, Foreign Commerce Club of Boston, Inc., and Export and Import Forwarding Association of Virginia. The interveners represent the majority of persons and businesses engaged in freight forwarding in the ports of Boston, Philadelphia, Baltimore, and Norfolk-Newport News. The interveners have urged that we uphold Rule 510.22(a).
 
 
 [3]
 In denying the forwarders' petitions for reconsideration of the rule the Commission declared that 510.22(a) 'will not be interpreted to require that a carrier deny compensation where a forwarder requests but the carrier does not render the services requested.'
 
 
 [4]
 The 1936 Act declares, 'It is necessary for the national defense and development of its foreign and domestic commerce that the United States shall have a merchant marine * * * to provide shipping service on all routes essential for maintaining the flow of * * * domestic and foreign water-borne commerce at all times.' 46 U.S.C. 1101