**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Armand VENTURA,**
**Defendant-Appellant.**

No. 1405, Docket 83–1080.

United States Court of Appeals,
Second Circuit.

Argued June 14, 1983.

Decided Dec. 13, 1983.

Morris Weinberg, Jr., Asst. U.S. Atty., New York City (John S. Martin, Jr., U.S. Atty., S.D.N.Y., Walter P. Loughlin, Asst. U.S. Atty., New York City, on the brief), for plaintiff-appellee.

Richard B. Marrin, New York City (William P. Ford, Cushing O. Condon, Ford, Marrin, Esposito & Witmeyer, New York City, on the brief), for defendant-appellant.

Before FRIENDLY, KEARSE and CARDAMONE, Circuit Judges.

KEARSE, Circuit Judge:

Defendant Armand Ventura appeals from a judgment entered in the United States District Court for the Southern District of New York, after a jury trial before William C. Conner, Judge, convicting him on one count of conspiring to defraud the Agency for International Development ("AID") and the World Bank, in violation of 18 U.S.C. § 371 (1976), and four counts of wire fraud, in violation of 18 U.S.C. § 1343 (1976). Ventura was sentenced to four concurrent terms of eighteen months' imprisonment on the wire fraud counts and was assessed a committed fine of $10,000 on the conspiracy count. On appeal Ventura contends principally that his conviction should be reversed and the indictment against him dismissed because his conduct was commonplace business activity not prohibited by any law. We reject Ventura's contentions and affirm the conviction.

## I. BACKGROUND

Ventura and his alleged coconspirators defendant Eugene Pagano and Paul Munsch[1] were officers or agents of an ocean freight forwarder, Cargo Export Corporation ("CEC"). The prosecution centered on an alleged kickback scheme involving the inflation of the cost of shipping certain freight from the United States to an AID-financed project in Bangladesh. The essence of this scheme, according to the government, was the employment by CEC of unnecessary middlemen, called non-vessel-operating common carriers or "NVOCCs," in order to increase the shipping costs to be charged AID. The conspirators were to profit from this arrangement by accepting from the NVOCCs a portion of the difference between the price charged to AID by the NVOCCs and the lower price charged to the NVOCCs by the steamship line that actually carried the cargo.

### A. The Shipping Industry

The expert witnesses for the government and the defendants painted the following background picture of the shipping industry. An ocean freight forwarder is an entity that arranges transportation of goods on behalf of a shipper from a United States location to an overseas location. The freight forwarder, acting as the shipper's agent, takes delivery of the goods, routes them to their destination, prepares documentation, arranges for any necessary storage, and completes any other tasks relating to the movement of the goods. Freight forwarders must be licensed by the Federal Maritime Commission ("FMC"), see 46 C.F.R. § 510.3 (1977),[2] and are strictly regulated, id. § 510.

The ocean freight forwarder arranges for an "oceangoing common carrier," see id. § 510.21(c), to transport the goods to their ultimate destination. Oceangoing common carriers are divided into two categories based upon whether or not they transport goods on their own ships: a vessel-operating common carrier ("VOCC") is a steamship company that transports the goods overseas on its own ships; an NVOCC is a common carrier without ships. See id. § 510.21(d). The NVOCC, unable itself to

---

**1.** Munsch pleaded guilty to conspiracy before trial. He entered into a cooperation agreement with the government and was a principal witness at the trial.

**2.** References are to the regulations in effect during the period of Ventura's involvement in the kickback scheme.

move the goods overseas, usually performs such services for the shipper as consolidating small cargoes in large containers in order to obtain better rates from VOCCs; on occasion NVOCCs perform special services such as supplying trucks and heavy lifting equipment. Because an NVOCC does not own ships, any plan of shipment involving an NVOCC must also involve a VOCC. If a shipper does not require the services of an NVOCC, it need not deal with an NVOCC but may deal directly with a VOCC.

Ocean carriers' rates for transporting goods are set forth in published tariffs. Ordinarily, the freight forwarder is paid a commission for its services out of the published tariff rate charged the shipper by the VOCC, or if an NVOCC is involved, by the NVOCC. This commission, published as part of the VOCC's or NVOCC's tariff, is a non-negotiable percentage, normally ranging from 1¼ to 3¾ percent of the gross freight charged by the carrier. The freight forwarder is not entitled to payment from a common carrier in excess of the established percentage. In addition to this primary compensation, the freight forwarder often receives a small fee—normally in the range of $3 to $5 per task—from the shipper for documentation work. *See id.* § 510.24(e) & (f). In both cases this compensation must be for services actually performed by the freight forwarder. *See id.*

Often VOCCs form associations, or join together to form "conferences," in order to set uniform rates to be charged with respect to a particular geographic trade area. *See id.* § 522. The conference files a joint tariff with the FMC, *see id.* § 522.3, and thereafter conference members are usually permitted to charge only the rates set forth in the tariff. *See id.* §§ 522.2(a)(1)(i), 522.-6.[3] Conference VOCCs, which generally offer faster and better service than nonconference VOCCs, but at higher rates, may enter into special contracts with shippers whereby the shipper agrees to ship all his

cargo with conference members in exchange for a lower rate. *Id.* § 522.4.

## B. *The Bangladesh Project*

The events preceding the arrangements for the particular shipments on which this prosecution focused are not in dispute. In 1975, the United States, through AID, joined a group of industrialized nations in financing a $350 million project (the "Project") in Bangladesh. Each of the participating nations was to ship to Bangladesh large quantities of materials, as coordinated by Foster Wheeler Ltd. ("Foster Wheeler"), which was acting as general engineer and prime contractor. To facilitate the shipment of materials, Foster Wheeler awarded contracts, through a bid process, to freight forwarders in each of the participating nations. In 1976, it awarded the freight forwarding contract relating to United States materials to CEC.

CEC, a licensed freight forwarder, had been formed in 1971 by Munsch and Pagano. Pagano, the President, was in charge of operations; Munsch served as Secretary-Treasurer in charge of accounting and finance. In 1974, CEC retained Armand International, Ltd. ("AIL"), as a commissioned sales representative. AIL was a personal holding company formed by Ventura in 1972 and controlled by him throughout its existence. In 1974 Ventura undertook marketing responsibilities for CEC and often represented himself to others as CEC's Vice President and Director of Marketing.

It was Ventura who obtained the Foster Wheeler contract for CEC. He met with Foster Wheeler officials in England to solicit the account, prepared and submitted CEC's written bid, and signed the bid letter and other correspondence to Foster Wheeler, designating himself as CEC's Vice President and Director of Marketing. After CEC received the contract from Foster Wheeler, Ventura retained responsibility for matters relating to the Project and be-

---

**3.** Once such a joint tariff is filed, the conference is exempted from the antitrust laws by the

Shipping Act of 1916, 46 U.S.C. § 814 (1976).

came CEC's primary contact with Foster Wheeler.

Foster Wheeler sought to ensure the availability of ships to carry Project cargo by contracting with the Burma Outward Freight Conference (the "Burma Conference") for carriage of all Project shipments from the East Coast of the United States to Bangladesh. At Foster Wheeler's request, Ventura initially negotiated a special 10% discount from the Burma Conference for all Project shipments. On Ventura's recommendation, Foster Wheeler subsequently signed an agreement with the Burma Conference in April 1977 that obligated Foster Wheeler to use only Burma Conference ships in exchange for a further 15% discount on most freight items and for the Conference's agreement to ensure the availability of ships for Project cargo leaving from the East Coast of the United States.

The parties disagree as to the proper interpretation of what followed.

C. *The Government's Proof as to the NVOCC Scheme*

The principal witness for the government as to Ventura's actions following Foster Wheeler's 1977 agreement with the Burma Conference was Munsch, CEC's Secretary-Treasurer. Viewed in the light most favorable to the government, the evidence at trial revealed that Ventura proceeded to devise a scheme to employ unnecessary NVOCCs in order to inflate the freight charges to be paid by AID. To effect this scheme, Ventura ignored Foster Wheeler's exclusive-dealing contract with the Burma Conference and booked the carriage of Project freight through the combination of an inexpensive non-Conference VOCC and one or more NVOCCs. The NVOCC was to perform no service other than submitting a bill of lading. The NVOCC and Ventura agreed on a rate for the NVOCC to charge AID that was slightly lower than the established Burma Conference rate but much higher than the rate directly available to AID from the non-Conference VOCC that was to transport the goods. After the NVOCC submitted its bill of lading to Fos-

ter Wheeler and AID as proof of the freight rate, the NVOCC and CEC were to split the "middle"—*i.e.,* the difference between the low rate the steamship line charged the NVOCC and the higher rate the NVOCC charged AID. CEC's share of the "middle" far exceeded both the brokerage percentage it was permitted to receive under the NVOCC's published tariff and the brokerage fee CEC would have been permitted to receive if it had either used a Burma Conference ship or booked a non-Conference ship without bringing in the NVOCC. To make this scheme work, it was necessary for CEC and Ventura to conceal from Foster Wheeler and AID the actual rate charged by the non-Conference VOCC, CEC's ability to book the Project cargo with that VOCC directly, and the portion of the "middle" that CEC was to receive.

The first and largest transaction in which this scheme was implemented involved shipment in the fall of 1977 of a 630,000-pound rock crusher and cement batching plant. Ventura enlisted the aid of one Paul Semack, who was an employee of an NVOCC called MTS Agencies ("MTS"); at Semack's insistence, Ventura also brought in ROCO Worldwide ("ROCO"), another NVOCC, to be listed as the NVOCC of record. Although Burma Conference ships were available to transport the rock crusher, no one attempted to secure carriage on such a ship. Instead, Semack proceeded to book transport of the rock crusher with Bangladesh Shipping Corporation ("BSC"), a non-Burma Conference line that was the national steamship line of Bangladesh, for $106,000. Ventura and Semack agreed that AID would be charged freight of $158,000, and they had ROCO file a tariff that would yield a gross freight rate of $158,000 for the rock crusher. This created a "middle" of $52,000. ROCO, which performed no services other than creating a bill of lading at the $158,000 rate agreed upon between Ventura and Semack, was paid $5,000 out of the "middle." The remaining $47,000 was divided among MTS, CEC, and Ventura. At trial Ventura admitted having re-

ceived $16,700 in this transaction.[4] At normal commission rates, the total freight forwarding fee on gross freight of $106,000 would have been in the range of $1325 to $3975.

In two similar but smaller transactions, Ventura arranged for ROCO to secure carriage of appliances for the Project from the West Coast on Scindia Lines for a total of $34,000. ROCO charged AID $43,000, and the $9000 "middle" was divided among MTS, ROCO, CEC, and Ventura. Ventura's share was $1605.

After submitting the $158,000 freight invoice to AID for carriage of the rock crusher by BSC, CEC learned that AID would not make payment for any shipments of Project cargo delivered by ships from the host country, Bangladesh. When CEC's attempt to obtain a waiver of this restriction proved unsuccessful, Ventura sent Foster Wheeler a telex dated November 10, 1977, in which he stated that no ship other than the Bangladeshi vessel was available, and that CEC's use of that vessel would save Foster Wheeler $25 per ton. In fact, Ventura had made no attempt whatever to book carriage on a Burma Conference ship and indeed had made no effort to determine whether any such ships were scheduled to sail to Bangladesh. Semack testified that Conference ships were available. Relying on the representations in Ventura's telex,[5] Foster Wheeler and AID interceded with World Bank, another project donor, to pay the freight for the rock crusher. After World Bank agreed to fund the shipment, Ventura submitted the ROCO bill of lading in the amount of $158,000 to World Bank. Neither Ventura nor CEC disclosed to World Bank that BSC's rate was actually $106,000, or that Ventura could book the cargo with BSC directly, or that the use of unnecessary NVOCCs created a $52,000 "middle."

Munsch and Pagano ended Ventura's involvement with the Project in early 1978 when they came to believe that Ventura was acting to divert other business from CEC to further his own interests.[6]

D. *Ventura's Defense*

Ventura testified on his own behalf, asserting that his use of NVOCCs for the rock crusher and appliance shipments was a legitimate business practice not uncommon in commercial shipping. He admitted having received $16,700 as the result of his participation in the rock crusher shipment and $1605 as the result of his participation in the appliance shipment, but stated that he was entitled to these payments for his efforts as a commissioned salesman and independent cargo broker.

Ventura testified that no Burma Conference ships had been available to transport the rock crusher. He testified that the sole reason for his going to MTS was to locate an available ship, that he did not seek to insert an unnecessary NVOCC, and that it was Semack who suggested that they split the "middle" created by the rock crusher shipment. He denied agreeing with Munsch and Pagano to defraud AID, and denied discussing with Munsch the use of unnecessary NVOCCs. Finally, he denied knowing that ROCO was an NVOCC, and asserted that ROCO had paid him the $1605, the amount the prosecution alleged to be Ventura's share of the "middle" creat-

4. Ventura had not fully disclosed the figures to CEC. Rather, Munsch and Pagano were informed that the "middle" would be $36,000, to be split between CEC and the NVOCC. Ventura did not disclose that there would be an additional $16,000 that he would receive for himself.

5. The government presented evidence that in furtherance of the NVOCC scheme Ventura sent or caused to be sent three additional wire communications relating to the shipment of Project cargo: an October 7, 1977 telex from CEC to Foster Wheeler; an October 10, 1977 telex from Foster Wheeler to CEC; and a January 18, 1978 wire transfer of funds from World Bank to CEC.

6. There was evidence that Munsch and Pagano thereafter inflated ocean freight charges to AID in other ways. The prosecution stipulated, and the district court instructed the jury, that none of this evidence was to be considered against Ventura. *See* Part II.B., *infra*.

ed by the appliance shipments, without solicitation.

On cross-examination, Ventura conceded that CEC had been hired by Foster Wheeler precisely to find ships to transport Project cargo to Bangladesh; that he had made no attempt either to contact the Burma Conference or to consult the Journal of Commerce (normally the freight forwarder's first step in locating a ship) with respect to the availability of ships for carriage of the rock crusher; and that he had made no effort to book the rock crusher directly on a lower priced steamship line. He admitted that a freight forwarder owes duties of good faith and truthful disclosure to the shipper and acknowledged that he had not informed Foster Wheeler, World Bank, or AID that use of NVOCCs had created a $52,000 "middle" in the rock crusher shipment. He also acknowledged that the normal brokerage fee that CEC would have received under ROCO's published tariff for the rock crusher shipment was substantially less than the portion of the "middle" CEC actually received.

### E. The Verdicts

The jury found Ventura guilty on all of the counts on which he was charged, *i.e.*, one count of conspiracy to defraud AID and World Bank, in violation of 18 U.S.C. § 371, and four counts of wire fraud, in violation of 18 U.S.C. § 1343. Pagano, who had presented a defense of chronic alcoholism such as to make him not responsible for his conduct, was acquitted on all of the counts against him.

### II. DISCUSSION

On appeal, Ventura contends principally that his conduct "simply was not ... crim[inal]" because (1) it is not a crime for a freight forwarder to receive as its compensation more than the commission published as part of the carrier's filed tariff and (2) the freight forwarder has no fiduciary duty to disclose to the shipper the compensation the forwarder received from the carrier. In addition, Ventura raises a number of claims

of error in the conduct of his trial. We find none of his contentions persuasive.

### A. Wire Fraud

The wire fraud statute, 18 U.S.C. § 1343, provides as follows:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communications in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

This provision, paralleling the section prohibiting mail fraud, 18 U.S.C. § 1341 (1976), has been construed by this Court to reach the use of wire communications in furtherance of a breach of fiduciary duty when the fiduciary has failed to disclose material information that "he is under a duty to disclose to another under circumstances where the non-disclosure could or does result in harm to the other." *United States v. Siegel*, 717 F.2d 9, 14 (2d Cir.1983) (wire fraud) (quoting *United States v. Newman*, 664 F.2d 12, 19 (2d Cir.1981) (mail fraud)); *United States v. Bronston*, 658 F.2d 920, 926–27 (2d Cir.1981) (mail fraud), *cert. denied*, 456 U.S. 915, 102 S.Ct. 1769, 72 L.Ed.2d 174 (1982); *United States v. Von Barta*, 635 F.2d 999, 1005 n. 11, 1006 (2d Cir.1980) (mail and wire fraud), *cert. denied*, 450 U.S. 998, 101 S.Ct. 1703, 68 L.Ed.2d 199 (1981).

The question central to the present prosecution is whether Ventura had a fiduciary duty to disclose that CEC could book transport of Project cargo directly on the VOCC to be used and that the NVOCCs were brought in only to inflate the freight charges to Project contributors. We believe the question must be answered in the affirmative.

A shipper retains a freight forwarder because of the freight forwarder's expertise

in securing the dispatch of cargo to a foreign destination. Because of this expertise and the freight forwarder's greater access to information from NVOCCs and VOCCs, the shipper relies on the freight forwarder's representations regarding the suitability, efficiency, and economy of using certain carriers, the availability of ships, and other matters relating to the shipment. Moreover, because of the shipper's inability to monitor every step in the shipping process, the freight forwarder must often make arrangements for shipment details without express approval for these arrangements from the shipper. The freight forwarder thus exercises considerable control over the transport-related decisions of the shipper. In describing the shipping industry, the government's expert witness termed the relationship between a shipper as principal and freight forwarder as agent "a fiduciary relationship" "of the greatest trust and fidelity" (Tr. 96), and stated that the freight forwarder "has the obligation of trying to obtain for the shipper the cheapest and the most efficient and most economical transportation that he can." (*Id.*) Recognizing the nature of this relationship, courts have described freight forwarders as "agents of the shipper" for the purposes of arranging cargo transport, *United States v. American Union Transport, Inc.*, 327 U.S. 437, 443, 66 S.Ct. 644, 647, 90 L.Ed. 772 (1946), and as, essentially, "export departments for their shipper clients," *New York Foreign Freight Forwarders and Brokers Ass'n v. Federal Maritime Comm'n*, 337 F.2d 289, 292 (2d Cir.1964), *cert. denied*, 380 U.S. 910, 85 S.Ct. 893, 13 L.Ed.2d 797 (1965).

The contract between Foster Wheeler and CEC, as reflected in a letter from the former to CEC, "Attention of Armand J. Ventura," and letters and telexes to Foster Wheeler signed by Ventura as CEC's "Vice President & Director/Marketing," does not appear to have created an atypical shipper-freight forwarder relationship. Foster Wheeler's letter dated September 23, 1976, confirmed that CEC had been appointed "forwarded agent" to arrange Project shipments for Foster Wheeler from the United States. It outlined some of CEC's duties, including those of preparing bills of lading, keeping close check on the movement of cargo, and prepaying ocean freight charges. The agreement expressly required CEC to "[n]egotiate favourable contract freight rate."

FMC regulations, recognizing that the freight forwarder acts on behalf of the shipper as his "principal," provide that a freight forwarder may not operate unless he is licensed, *see* 46 C.F.R. § 510.3(a) (1977), and they establish a duty of good faith and fair dealing on the part of the freight forwarder. Thus, § 510.23(d) provides that a

> licensee shall exercise due diligence to ascertain the correctness of any information which he imparts to a principal with reference to any forwarding transaction, and no licensee shall knowingly impart to a principal or oceangoing common carrier false information relative to any such transaction.

Section 510.23(e) requires that a freight forwarder make full disclosure to the shipper:

> (e) No licensee shall withhold information relative to a forwarding transaction from his principal.

Further, no freight forwarder may "file or assist in the filing of any claim ... or other paper or document, with respect to a shipment handled, or to be handled, ... which he has reason to believe is false or fraudulent." *Id.* § 510.23(h).

█ It is plain, therefore, from the evidence as to the prevailing practice in the industry, from the contract between Foster Wheeler and CEC, and from the FMC regulations that, insofar as the arrangement of transport for Project cargo was concerned, CEC and Ventura, who held himself out as a CEC official, had certain fiduciary responsibilities to Foster Wheeler. They were to act as agent for Foster Wheeler; they had an obligation to negotiate favorable freight rates; and they had an obligation not to withhold from Foster Wheeler any information regarding the forwarding transactions. There can be no doubt that such fiduciary duties are breached by a freight forwarder

who, for his own personal gain, causes his principal to breach an exclusive dealing agreement, and who locates a favorable freight rate, conceals that rate from his principal, brings in a middleman to have the middleman file a tariff with a 50% higher rate, and causes his principal to pay the 50% higher rate, all in order to take for himself a share of the difference between the favorable rate and the higher rate.

Notwithstanding Ventura's protestations that his use of NVOCCs was essential to allow him to find a ship to transport the Project cargo, the evidence in this regard must be viewed in the light most favorable to the government. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). Interpreted in that light, the proof was ample that MTS and ROCO performed no services whatever and that Ventura brought them in for no purpose other than to have them create the large "middle" to be shared by Ventura and his coconspirators.

The facts concealed by Ventura were plainly material. They caused Foster Wheeler and AID to approve payment of freight charges of $158,000 rather than $106,000. The concealment was furthered by Ventura's affirmative misrepresentation in his November 10, 1977 telex to Foster Wheeler that the impetus for his arrangements was the unavailability of any Burma Conference vessel to carry the rock crusher. In fact, Ventura had never sought to determine whether or not a Conference ship was available, and such ships were available.

We conclude that the evidence as to Ventura's actions adequately showed "a scheme or artifice to defraud [and] for obtaining money . . . by means of false or fraudulent pretenses [or] representations" within the meaning of the wire fraud statute.

## B. *Severance*

Ventura's other principal contention is that the district court should have granted his motion for a severance of his trial from that of Pagano.[7] The contention has no merit.

We have held repeatedly that, absent a showing of substantial prejudice, defendants who are jointly indicted should be jointly tried. *See, e.g., United States v. Lyles,* 593 F.2d 182, 191 (2d Cir.), *cert. denied,* 440 U.S. 972, 99 S.Ct. 1537, 59 L.Ed.2d 789 (1979); *United States v. Taylor,* 562 F.2d 1345, 1362–63 (2d Cir.), *cert. denied,* 432 U.S. 909, 97 S.Ct. 2958, 53 L.Ed.2d 1083 (1977). The trial court's denial of a motion to sever will be overturned only if the appellant can show that the denial constituted an abuse of discretion. *Opper v. United States,* 348 U.S. 84, 95, 75 S.Ct. 158, 165, 99 L.Ed. 101 (1954); *United States v. Finkelstein,* 526 F.2d 517, 523 (2d Cir.1975), *cert. denied,* 425 U.S. 960, 96 S.Ct. 1742, 48 L.Ed.2d 205 (1976); *United States v. Turcotte,* 515 F.2d 145, 150 (2d Cir.), *cert. denied,* 423 U.S. 1032, 96 S.Ct. 564, 46 L.Ed.2d 406 (1975).

Ventura argues that he suffered substantial prejudice from being tried jointly with Pagano because there was a great deal of evidence against Pagano relating to fraudulent conduct by CEC after Ventura's participation had ended. We are unpersuaded. The government stipulated that this proof was not being offered against Ventura. The trial judge, in receiving the evidence, was careful to inform the jury that it could not be considered against Ventura. In charging the jury, the judge incorporated the government's stipulation and took care to admonish the jury to disregard any testimony or exhibits with regard to these later events when determining the guilt or innocence of Ventura. Our review of the record provides us with no basis for inferring that the joint trial of Ventura and Pagano rendered the jury unable to render a fair and impartial verdict as to Ventura. We see no substantial prejudice to Ventura and no abuse of the trial court's discretion.

7. We have also considered and find without merit Ventura's claims that the trial court erred in instructing the jury and in receiving proof of certain events not directly related to the rock crusher and appliance shipments.

CONCLUSION

The judgment of conviction is affirmed.